**Marguerite HICKS, Plaintiff–Appellant,**

v.

**The GATES RUBBER COMPANY, Defendant–Appellee.**

**No. 84–1232.**

United States Court of Appeals, Tenth Circuit.

Nov. 25, 1987.

---

Elisa Moran, Denver, Colo. (John Mosby, Denver, Colo., was also on the brief), for plaintiff-appellant.

Steven F. Biskup, Denver, Colo. (David R. Gorsuch of Gorsuch, Kirgis, Campbell, Walker and Grover, Denver, Colo., was on the brief), for defendant-appellee.

Before HOLLOWAY, Chief Judge, SETH, Circuit Judge, and CROW, District Judge.[*]

HOLLOWAY, Chief Judge.

This an appeal by Plaintiff Marguerite Hicks ("Hicks") from a judgment by the district court in a Title VII action in favor of Gates Rubber Company ("Gates"). The case arose out of a series of incidents that occurred during a brief, eight month period of employment of Hicks by Gates. Stripped to its essential elements, Hicks' claim was that she was subjected to racial harassment in violation of 42 U.S.C. § 1981 (1982), and that she was subjected to racial and sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982). In addition, Hicks alleged that when she complained of the harassment to the Equal Employment Opportunity Commission ("EEOC"), she was retaliatorily discharged. In defense, Gates maintained that Hicks was neither sexually nor racially harassed, and that she was discharged solely because of unsatisfactory job performance. An outline of the evidence follows.

## I

On July 15, 1980, Hicks, a black woman, was hired by Gates as a security guard. At the time she began working, Gates employed thirty people in its security force. Hicks was the only black woman in the

---

[*] The Honorable Sam Crow of the District of Kansas, sitting by designation.

security force, and one of only two black guards.

The primary responsibility of the security guards at Gates was to patrol the Gates plant and grounds. To ensure the thoroughness of these patrols, Gates had developed an elaborate system—known as "walking the keys"—that monitored a guard's progress on patrol. In essence, the system required each guard to carry a time clock on patrol which was activated by keys strategically placed at ninety-three various locations on the patrol route. When a guard reached one of the locations, he or she inserted the key into the clock which recorded the time of the guard's arrival. Although the time involved in "walking the keys" could vary depending on external factors, the optimal rate for patrolling the grounds was fifteen keys per half hour. In addition guards carried short-wave radios and were subject to periodic radio checks. Guards were also required to maintain daily logs that detailed any variation from the normal patrol routine.

When a new employee began working at Gates, the employee was automatically placed on a ninety day probationary period, during which time he or she could be discharged without cause.

At trial, Hicks sought to establish that the work environment at Gates during her probationary period was permeated with racial and sexual hostility. Gates' employees testified that an atmosphere existed in which racial slurs and jokes were tolerated. III R. 40–42. At least one supervisor, Gleason, referred to blacks as "niggers," III R. at 40, and "coons." IV R. 162. On one occasion, Gleason was said to have made a reference to "lazy niggers and Mexicans" that appeared to have been specifically directed at Hicks. IV R. 236. In a similar vein, one of the security guards, Brawley, referred to Hicks as "Buffalo Butt." IV R. 164.

Hicks claimed that early in her probationary period she was subjected to disparate treatment by both supervisors and coworkers. She complained that her trainer, Lyon, forced her to make a four or five foot jump off of a loading dock, III R. 51–52; and that Lyons, in contravention of standard procedure, would not permit her to sit while conducting the plant inspection. III R. 52. She asserted that on one occasion supervisor Holec refused to allow her to take her lunch break at the usual time, instead requiring her to relieve a white coworker, III R. 54; and that Holec insisted that she ride in a car even though the passenger seat was wet, the consequence of which was that she was forced to "walk the plant with wet pants the rest of the shift." III R. 55. Hicks also claimed that during her probationary period she was sexually harassed. She recounted an incident during a trip to patrol the hangar where Holec reached over and rubbed her thigh and said, "I think you're going to make it." III R. 55. Finally, Hicks delineated examples of hostility exhibited by coworkers.

Evidence offered by Gates differed radically from Hicks' account of her probationary period. According to Gates, Hicks had difficulties performing her duties as a security guard from the very beginning of her employment. Her trainer, Lyons, testified that during her training, Hicks was unable to accurately remember the locations of the keys along the patrol route, V R. 449–54, and as a consequence, he was instructed by his supervisor to simplify the training program to accommodate her memory problems. Lyons testified that Hicks' performance was so deficient that by the end of the first week, he had begun to question her ability to adequately perform the work. V R. 450. Lyons also found it necessary to extend Hicks' training period from the normal time of one week to four weeks. V R. 457. Even at the end of four weeks, Lyons did not really feel she was capable of fully performing her duties as a security guard.

Gates also challenged Hicks' interpretation of the events cited by her as evidence of disparate treatment. The loading dock event was said to be a minor incident that occurred when Hicks' trainer took a short cut to make up lost time on the patrol route. The incident when Hicks' pants got

wet was described as the result of an inadvertent oversight. V R. 468. Finally, Gates strenuously disputed Hicks' contention that she had been sexually harassed by Holec, asserting that Hicks had misconstrued an innocent and harmless gesture of encouragement.

Despite difficulties, Hicks successfully completed her probationary period, becoming a full time guard on October 15, 1980. However, Hicks said she soon began to experience difficulties with her supervisor, Gleason. On November 8, 1980, Gleason told Hicks "that he would put his foot up [her] ass so far that [she] would have to go to clinic to take it out." III R. 56. In addition, Hicks said that the following day, November 9, Gleason touched her on the buttocks and said " 'I'm going to get you yet.' " III R. 56. At about this time, on instructions from the manager of security, Ely, Gleason also began making notations on Hicks' job performance.

Hicks also had problems with some of her coworkers. On November 18, 1980, for instance, Hicks had a heated verbal exchange with one of the other guards, Phyllis Adams. This altercation was the subject of an informal meeting with Ely on November 19. He warned Hicks that he was "not going to have this kind of action out of [her]. . . ." III R. 61. Hicks filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 21. She alleged racial and sexual harassment arising out of the general work environment, as well as specific instances of harassment.

On November 29, Hicks was involved in an incident with another Gates security guard, Patricia Roe, in which Hicks allegedly challenged Roe to a fight. After an investigation of the incident by Ely, Hicks was issued a Derogatory Personnel Notation ("DPN") on December 2, 1980 and suspended for three days. In response, Hicks filed a second charge of discrimination with the EEOC alleging that the suspension was in retaliation for her earlier charge of discrimination.

On December 15, 1980, Hicks received a verbal warning for poor performance by Ely. In the record of verbal warning, Ely delineated five areas in which Hicks' job performance was unsatisfactory: (1) missing too many keys during her patrol, and walking less than fifteen keys per half hour; (2) taking too long in inspecting Mr. Gates' house and hangar; (3) failing to follow her supervisor's instructions; (4) missing or reporting late on too many radio checks; and (5) failing to report all deviations from her normal patrol route on her daily report. On December 19, Hicks again responded to the discipline by filing a claim of retaliation with the EEOC.

Not long after receiving the verbal warning, Hicks said that she was again sexually harassed by Gleason. She was taking a break on patrol when Gleason drove up in a go-cart. He stopped and said, "I caught you," or "I got you." III R. at 70. He then allegedly grabbed Hicks' breasts and she "fell over, and he got on top of [her]." III R. 70. Gleason denied such acts.

On January 3, 1981, Hicks injured her leg, back and head when she slipped and fell on a broken step while walking the keys. Although her supervisor, Gleason, knew of the broken step, he did not warn the guards on the swing shift—including Hicks—of the danger. On February 12, Hicks filed her fourth EEOC claim, alleging that her injury was in retaliation for having filed the previous EEOC complaints.

As a result of her injury, Hicks missed work for six days, returning to work on January 12, 1981. On her return, her injuries prevented an immediate resumption of her guard duties. Consequently, she was given a "light duty slip" by the Gates clinic for the week following her return, relieving her from walking the keys. When she resumed her regular duties, however, Hicks continued to have persistent pain in her back that interferred with her job performance. On February 7, Hicks was given a DPN for poor job performance.

On February 10, Hicks received a verbal warning for mishandling a weapon when her gun was accidentally dropped. On February 23, Hicks was again disciplined for a second incident involving the mishandling of her weapon. On March 17, a

hearing was held at which Hicks was discharged for poor work performance. On April 20 Hicks filed her final complaint with the EEOC, contending that she had been retaliatorily discharged for her four prior complaints.

## II

After a bench trial, the district court rejected Hicks' claim of a racially hostile work environment, along with all her claims of disparate and retaliatory racial treatment and sexual harassment. The trial judge's findings stated, *inter alia,* that plaintiff's trainer determined that she required additional time in learning her job as she was slow in learning the location of all the keys she was required to punch. Additional training was a result of plaintiff's needs and there was not an impermissibly discriminatory reason for additional training and no evidence indicating her training was more rigorous or abusive than that required of non blacks or that it was designed to harass her into quitting.

The court found that there was no evidence to support plaintiff's claim that defendant maintained and permitted a work environment openly hostile to black employees. The only evidence suggestive of this was disputed testimony of specific statements by fellow workers, but there was no evidence that defendant condoned such conduct. Plaintiff testified about certain acts of unwarranted violation of her person by supervisory personnel. The court found the incident of patting her thigh by Hollec was an isolated incident in which there was no sexual advance intended.

The court found that acts alleged to have been committed by Gleason (squeezing her buttocks one time and touching her breasts on another) were found to be only in dispute as to the degree of the violation, and that "the plaintiff was subjected by Mr. Gleason to unwarranted touching of her person and to familiarities neither invited nor encouraged by her." I R. 58. The court found notwithstanding that the evidence only indicates these incidents were "the consequences of Mr. Gleason's own

proclivities, and there was never a suggestion made by Mr. Gleason that submission to his attentions was a condition of favorable supervisory treatment by him or continuation of her employment. Indeed it appears that Mr. Gleason was guilty of gratuitous acts of boorish personal conduct unrelated to any overt or implicit demand or invitation by him for responsive conduct of any kind by plaintiff. It is in dispute as to whether Mr. Gleason's acts toward plaintiff were brought to the attention of Mr. Ely, the supervisor of the Guard Division, and [the court could] find no basis for resolution of the conflict." I R. 59.

The court recounted the several complaints filed by plaintiff with the EEOC and noted that on July 29, 1981, the EEOC notified plaintiff it could find no reasonable cause to support the plaintiff's complaints.

With respect to the December 2, 1982 complaint with the EEOC, the court found this was the result of a challenge issued by plaintiff to fight another female security guard, the challenge was without provocation, and it was attended by provocative and unjustified behavior by plaintiff. The verbal warning delivered to plaintiff by Ely, the subject of her third EEOC complaint, was issued as a result of a regular semiannual spot check of time charts and daily reports, and the spot check was not instituted by Ely for any other purpose and plaintiff was not singled out for the spot check. The court found that the December 15, 1980 verbal warning for poor performance (missing too many keys, failing to meet the standard of 15 keys per hour, etc.) had a basis in fact.

With respect to plaintiff's fourth EEOC complaint concerning the fall when she was allegedly unwarned about a broken stair, the court found that Gleason had been advised of the broken stair but failed to warn any of the guards on plaintiff's shift of the dangerous condition and that there was no basis for the assertion that Gleason singled out plaintiff or that his failure to warn her was based on malice toward her.

Finally the court found that plaintiff's discharge on March 17, 1981 followed an investigatory hearing before Mr. Ely and

two members of defendant's personnel office; that the basis for the charges on which the discharge were made was the same as the verbal warning of December 15, 1980, poor performance; and that derogatory personnel notations had been given by Gleason with warnings about poor performance. The court found that at the time of the investigatory hearing plaintiff responded that her performance had been at the same level as other employees; but that she did not otherwise deny specific charges of poor performance. She asserted her inability to perform rounds within the standard of 15 keys per half hour was because of the injury she sustained in January 1981. The court found that there "is a basis in fact for the specific acts of poor performance upon which the disciplinary discharge was invoked." I R. 62. The court found that no other guards employed by defendants sustained the difficulties of plaintiff in achieving the standard or otherwise performing the same tasks assigned to her and that there is "no evidence that treatment of the plaintiff was different from treatment of non-black guards." I R. 64.

The court concluded plaintiff was not subjected to disparate treatment on the basis of race or gender by defendant; she was not subjected to the sort of sexual harassment cognizable under Title VII "because her tolerance of or consent to the acts of either Mr. Hollec or Mr. Gleason was not made a condition of her continued employment.... The defendant discharged the plaintiff because of her inability to adequately perform the job for which she was hired and for no other reason." I R. 64. Defendant articulated a good faith business reason for plaintiff's discharge as well as the other punitive action taken, and the punitive actions, including the discharge, were based on specific non-pretextual grounds and they were not in retaliation for filing of complaints with EEOC.

On appeal, Hicks alleges that the trial court erred (1) in determining that Hicks had not been subjected to racial harassment proscribed by Title VII and 42 U.S.C. § 1981; (2) in finding that Hicks had not been the victim of sexual harassment in

violation of Title VII; and (3) in concluding that Gates had articulated a legal, nondiscriminatory basis for terminating Hicks' employment. In addition, Hicks claims a variety of evidentiary errors at trial.

## III

### Racial Harassment

■ Title VII prohibits discrimination by an employer "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1) (1982). The trial court rejected Hicks' claim that Gates had violated Title VII by failing "to provide and ensure a work environment free from racial hostility and harassment and intimidation." I R. 3. Instead, the court found that "[t]he only evidence [supporting the claim] is disputed testimony of specific statements made by fellow workers, but there is no evidence whatever that the defendant condoned such conduct." I R. 58. Because we conclude that the trial court's finding was not clearly erroneous, we must uphold its rejection of the racial harassment claim.

■ It is well established that "a working environment dominated by racial slurs constitutes a violation of Title VII." *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir.1981). *Accord Walker v. Ford Motor Co.*, 684 F.2d 1355, 1358 (11th Cir.1982). "To establish a racially hostile work environment, however, plaintiffs must prove more than a few isolated incidents of racial enmity." *Snell v. Suffolk Co.*, 782 F.2d 1094, 1103 (2d Cir.1986). *Accord Gilbert v. City of Little Rock*, 722 F.2d 1390, 1394 (8th Cir.1983), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984). "Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute." *Snell*, 782 F.2d at 1103. *Accord Rogers v. Equal Employment Opportunity Comm'n*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). "Instead, there must be a steady barrage of opprobrious racial

comment." *Johnson*, 646 F.2d at 1257. Title VII is violated only where the work environment is so "heavily polluted with discrimination as to destroy the emotional and psychological stability of the minority [employee]." *Rogers*, 454 F.2d at 238.

We conclude that the trial judge's findings rejecting the claim that Gates maintained and permitted a work environment that was openly hostile to black employees are not clearly erroneous. The evidence shows incidents that were essentially occasional and incidental. *Snell*, 782 F.2d at 1103.

## IV

### Sexual Harassment

■ Sexual harassment, like racial harassment, is now universally recognized as employment discrimination within the meaning of Title VII. 1 A. Larson & L. Larson, *Employment Discrimination* § 41.62 (1987). *See, e.g., Meritor Sav. Bank v. Vinson*, 477 U.S. 57, ——, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) ("Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex."); Equal Employment Opportunity Commission, Final Guidelines on Sexual Harassment in the Workplace, 29 C.F.R. § 1604.11(a) (1986) ("Harassment on the basis of sex is a violation of Sec. 703 of Title VII.").

■ Although sexual harassment may take a variety of forms, courts have consistently recognized two distinct categories of sexual harassment claims: *quid pro quo* sexual harassment, and hostile work environment sexual harassment. *Katz v. Dole*, 709 F.2d 251, 254–55 (4th Cir.1983). *Quid pro quo* harassment occurs when submission to sexual conduct is made a condition of concrete employment benefits. *Henson v. City of Dundee*, 682 F.2d 897, 908 (11th Cir.1982). *Accord* 29 C.F.R. § 1604.11 (a)(1–2) (1986). Alternatively, hostile work

environment harassment arises when sexual conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Vinson*, 477 U.S. at ——, 106 S.Ct. at 2405, *quoting* 29 C.F.R. § 1604.11 (a)(3) (1986). "For [hostile work environment] sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Vinson*, at ——, 106 S.Ct. at 2406, *quoting Henson*, 682 F.2d at 904. Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. *Henson*, 682 F.2d at 904. *Accord* 29 C.F.R. § 1604.11(b) (1986).[1] The trial court found that while Hicks had been the victim of "unwarranted touching ... and familiarities," I R. 58, she had not been "subjected to the sort of sexual harassment cognizable under Title VII because her tolerance of or consent to the acts of either Mr. Hollec [sic] or Mr. Gleason was not made a condition of her continued employment." I R. 64. On appeal, Hicks challenges the trial court's determination on two grounds. First, Hicks contends that the evidence was insufficient to support the court's conclusion that she had not been the victim of *quid pro quo* sexual harassment. Second, Hicks maintains that the trial court failed to consider whether she had been subjected to hostile work environment sexual harassment.

### A. *Quid Pro Quo* Sexual Harassment

■ The trial court's finding that Hicks had not been subjected to *quid pro quo* sexual harassment must be assessed under the standard delineated in Fed.R.Civ.P. 52(a) (1982). *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1507, 84 L.Ed.2d 518 (1985). Under Rule 52(a), "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of

---

**1.** In connection with the trial court's findings here, we note that *Vinson* was decided well after the trial and the district judge's decision so that

he did not have the benefit of that opinion or its reliance on *Henson*.

the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a) (1982). "A finding of fact may be deemed 'clearly erroneous' only if the finding is without factual support in the record ... or if the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Colon-Sanchez v. Marsh,* 733 F.2d 78, 81 (10th Cir.), *cert. denied,* 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced it would have decided the case differently." *Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511. And the finding of no *quid pro quo* sexual harassment—whether as to a subsidiary or ultimate fact—must be reviewed under the clearly erroneous standard. *Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).

■ We cannot say that the trial court's finding of no *quid pro quo* sexual harassment was clearly erroneous. The gravamen of a *quid pro quo* sexual harassment claim is that tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature and that adverse job consequences result from the employee's refusal to submit to the conduct. The record fails to disclose any suggestion to Hicks—either explicitly or implicitly—that her employment was conditioned on granting sexual favors to Gleason or Holec. Similarly, the trial court found that the adverse job consequences Hicks suffered did not arise from her refusal to acquiesce in her supervisors' sexual conduct, but rather, were due solely to her inadequate job performance. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1512.

## B. Hostile Work Environment Sexual Harassment

■ In light of the trial court's conclusion that Hicks' claim was not "cognizable under Title VII because her ... consent to the acts ... was not made a condition of her continued employment," I R. 64, it seems clear that the court believed that Hicks could recover only for *quid pro quo* sexual harassment. As a result, the court failed to consider whether the "unwarranted touching ... and familiarities" to which Hicks was subjected, I R. 58, and other evidence established hostile work environment sexual harassment. As noted, the trial judge did not have *Vinson's* explication on the "hostile environment" theory.

"When findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue." *Pullman–Standard,* 456 U.S. at 292, 102 S.Ct. at 1792 (1982). *See also Vinson,* 477 U.S. 57, ——, 106 S.Ct. 2399, 2406, 91 L.Ed. 2d 49 (1986) ("Since it appears that the District Court made its findings without ever considering the 'hostile environment' theory of sexual harassment, the Court of Appeals' decision to remand was correct."). Nonetheless, Gates argues that even under a hostile work environment standard, "the record permits only one resolution of the factual issue." Because the trial court found only "two isolated events of sexual conduct toward Hicks," Appellee's Brief at 30, Gates argues that Hicks "failed to demonstrate any 'pervasive' conditions sufficient to allow the trial court to find that an abusive working environment had been created." *Id.* at 31.

It is true that "casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action." *Bundy v. Jackson,* 641 F.2d 934, 943 n. 9 (D.C.Cir. 1981). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Vinson,* 477 U.S. at ——, 106 S.Ct. at 2406, *quoting Rogers v. Equal Employment Opportunity Comm'n,* 454 F.2d 234, 238 (5th Cir.1971).

In considering the position of Gates, there are three legal questions involved: (1) whether acts that are not overtly sexual can nevertheless constitute "sexual" acts

under Title VII; (2) whether incidents of sexual harassment that are directed at employees other than the plaintiff can be used as evidence of hostile work environment sexual harassment; and (3) whether incidents of racial harassment which may, by themselves, be insufficient to support a racially hostile work environment claim can be combined with incidents of sexual harassment to prove a pervasive pattern of discriminatory harassment in violation of Title VII.

### 1.

■ Before 1985, there were opinions indicating that the predicate acts underlying a sexual harassment claim had to be clearly sexual in nature. *See e.g., Downes v. Federal Aviation Admin.,* 775 F.2d 288, 290 (Fed.Cir.1985); *Jones v. Flagship, Int'l,* 793 F.2d 714, 720 n. 5 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). *See also* 29 C.F.R. § 1604.11(a) (1982) (defining sexual harassment as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature....").

In 1985, the District of Columbia Court of Appeals rejected this narrow definition of sexual harassment in *McKinney v. Dole,* 765 F.2d 1129 (D.C.Cir.1985). There the court was directly confronted with the question "whether a physically aggressive but not explicitly sexual act by a male supervisor against a female employee may constitute part of a prohibited pattern of sexual discrimination." *Id.* at 1131. The court responded:

> We have never held that sexual harassment or other unequal treatment of an employee or group of employees that occurs because of the sex of an employee must, to be illegal under Title VII, take the form of sexual advances or of other instances with clearly sexual overtones. And we decline to do so now. Rather, we hold that any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or

pervasive, comprise an illegal condition of employment under Title VII.

. . . .

> Clearly, then, if a supervisor consistently uses physical force toward an employee because of that employee's sex, the use of such force may, if pervasive enough, form an illegal 'condition of employment.' So too a pattern of mixed sexual advances and physical force may be illegally discriminatory if based on the employee's sex....

*McKinney,* 765 F.2d at 1138–39.

■ We agree with the *McKinney* interpretation of the broad prohibition in Title VII making it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (1982). Thus on the remand that is ordered here, all the evidence relating to sexual harassment within the standard we accept from *McKinney* should be considered. Hicks introduced evidence of at least two incidents of serious sexual harassment, and the district judge found that they occurred. In addition, Hicks introduced evidence of threats of physical violence and incidents of verbal abuse. Such evidence should be considered in determining whether Hicks has established a hostile work environment sexual harassment claim.

### 2.

■ The second question is whether incidents of sexual harassment directed at employees other than the plaintiff can be used as proof of the plaintiff's claim of a hostile work environment. The answer seems clear: one of the critical inquiries in a hostile environment claim must be the *environment.* Evidence of a general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim. Indeed, "such evidence could be critical to a plaintiff's case, where a claim of harassment cannot be established without a showing of the isolated

indicia of a discriminatory environment." *Vinson v. Taylor,* 753 F.2d 141 (D.C.Cir. 1985), *aff'd in part and rev'd in part,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

The few courts that have addressed this issue have generally concluded that incidents involving employees other than the plaintiff are relevant in establishing a generally hostile work environment. In *Vinson,* the District of Columbia Court of Appeals concluded that the trial court's rejection of evidence of harassment of female employees other than the plaintiff was improper. "Evidence tending to show Taylor's harassment of other women working alongside Vinson is directly relevant to the question whether he created an environment violative of Title VII." *Id.* at 146. The court held that no evidence of sexual harassment directed specifically toward the plaintiff was necessary for a claim under Title VII: "Even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere where such harassment was pervasive." *Id.* at 146. This view finds support in racial discrimination cases brought under Title VII. *See Rogers v. Equal Employment Opportunity Comm'n,* 454 F.2d 234 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

Here Hicks introduced evidence that a number of employees had been sexually harassed by her supervisor, Gleason. On remand, such evidence should be considered by the trial judge in determining whether a hostile work environment sexual harassment claim has been established.

### 3.

■ The third question is whether, in determining the pervasiveness of the harassment against a plaintiff, a trial court may aggregate evidence of racial hostility with evidence of sexual hostility. We conclude that such aggregation is permissible.

■ The purpose of Title VII is "the removal of artificial, arbitrary and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classifications." *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Title VII prohibits an employer from discriminating against any individual because of race or because of sex. "The use of the word 'or' evidences Congress' intent to prohibit employment discrimination based on any or all of the listed characteristics." *Jefferies v. Harris Co. Community Action Ass'n,* 615 F.2d 1025, 1032 (5th Cir.1980).

In *Jefferies,* the plaintiff made claims of race and sex discrimination arising out of the defendant's failure to promote her and its decision to terminate her. When the trial court dismissed her claims of race discrimination and sex discrimination, the plaintiff appealed, arguing that the court had erred in refusing to consider her claim of discrimination based on both race and sex. The Fifth Circuit agreed. Relying on cases that disparate treatment of a subclass of women would constitute a violation of Title VII, *see e.g., Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971), the court concluded that "discrimination against black females [could] exist even in the absence of discrimination against black men or white women." *Jefferies,* 615 F.2d at 1032. We are persuaded that the *Jefferies* ruling is correct.[2]

■ Hicks introduced evidence that her supervisor, Gleason, had made serious racial slurs against blacks. Such evidence should be considered on remand to determine whether there was a pervasive dis-

---

**2.** *See also Graham v. Bendix Corp.,* 585 F.Supp. 1036, 1047 (N.D.Ind.1984) ("Under Title VII, the plaintiff as a black woman is protected against discrimination on the double grounds of race and sex, and an employer who singles out black females for less favorable treatment does not defeat plaintiff's case by showing that white females or black males are not so unfavorably treated."); *Chambers v. Omaha Girls Club,* 629 F.Supp. 925, 946 n. 34 (D.Neb.1986). *But see Degraffenreid v. General Motors Corp.,* 413 F.Supp. 142 (E.D.Mo.1976), *aff'd in part, rev'd in part on other grounds,* 558 F.2d 480 (8th Cir. 1977) (black women not a special Title VII class).

criminatory atmosphere, combining the racial and sexual harassment evidence, so that a hostile work environment harassment claim may have been established by Hicks. Even though we have held that the evidence sufficiently supports the discrete finding that Gates did not maintain a work environment openly hostile to blacks, Part III, that evidence on racial treatment should be considered for this combined purpose here with the sexual harassment evidence.

In sum, without expressing any view on the merits of the ultimate determination that should be made on the hostile work environment sexual harassment claim of Hicks, that claim is remanded to the district court for reconsideration. We are satisfied that the findings and conclusions in the written order of the trial judge show consideration of only the *quid pro quo* sexual harassment claim and that the alternative hostile work environment sexual harassment claim was not considered. As in *Vinson*, that claim must be remanded for consideration by the trial judge, taking into account the evidence of the types we have discussed above and held to be germane.

## V

### Notice

■ Relying on the trial court's inability to determine whether "Gleason's acts toward plaintiff were brought to the attention of Mr. Ely, the supervisor of the Guard Division," I R. 59, Gates argues that

Hicks failed to prove by a preponderance of the evidence that Gates had actual or constructive notice of any hostile work environment sexual harassment. As a consequence, Gates argues that it cannot be liable for any harassment to Hicks.[3]

The issue of employer liability was partially clarified by *Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The Supreme Court repudiated the view espoused by the District Columbia Circuit that "employers are always automatically liable for sexual harassment by their supervisors." *Id.* at ——, 106 S.Ct. at 2408. However, the Court appeared to reject an absolute requirement of notice. "[A]bsence of notice to an employer," the Court noted "does not necessarily insulate that employer from liability." *Id.* Moreover, the Court also rejected any notion that "the mere existence of a grievance procedure and a policy against discrimination, coupled with [an employee's] failure to invoke that procedure must insulate [an employer] from liability." *Id.* Instead, the Court suggested that the issue of employer liability should be determined with reference to agency principles. However, the Court struck a note of caution, recognizing that agency principles "may not be transferrable in all the particulars to Title VII." *Id.*

We find guidance in the Restatement (Second) of Agency § 219 (1958). Under § 219(1), an employer is liable for any tort committed by an employee "while acting in the scope of ... employment." *Id.* However, as one commentator noted, "[s]exual

---

**3.** In some instances proof has been required that the employer knew or should have known of the harassment and failed to take prompt and adequate remedial action. *See, e.g., Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982) ("Where ... the plaintiff seeks to hold the employee responsible for the hostile environment created by the plaintiff's supervisor ..., she must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action."); *Katz v. Dole*, 709 F.2d 251, 255 (4th Cir.1983) ("We believe that in a 'condition of work' case the plaintiff must demonstrate that the employer had actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action."). That view was chal-

lenged in *Vinson v. Taylor*, 753 F.2d 141 (D.C. Cir.1985), *aff'd in part and rev'd in part*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), which rejected any notice requirement. Relying heavily on the EEOC's Guideline on Discrimination Because of Sex—which endorsed a standard of strict liability—and Title VII decisions arising out of racial or religious discrimination, the District of Columbia Court of Appeals concluded that a notice requirement "would be a retreat from the level of protection Title VII has consistently and designedly afforded, and take a backward step...." *Id.* at 152. *See also Jeppsen v. Wunnicke*, 611 F.Supp. 78, 83 (D.C.Alaska 1985) ("[E]mployer knowledge is not an element of [a hostile environment] Title VII sex discrimination case.").

harassment simply is not within the job description of any supervisor or any other worker in any reputable business." Holtzman & Trelz, *Recent Development in the Law of Sexual Harassment: Abusive Environment Claims after Meritor Savings Bank v. Vinson*, 31 St. Louis U.L.J. 239, 276 (1987). Thus, "[c]onfining liability ... to situations in which a supervisor acted within the scope of his authority conceivably could lead to the ludicrous result that employers would become accountable only if they explicitly require or consciously allow their supervisors to molest women employees." *Vinson v. Taylor*, 753 F.2d 141, 151 (D.C.Cir.1985), *aff'd in part and rev'd in part*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

Although § 219(1) of the Restatement of Agency provides scant assistance in assessing employer liability under Title VII, § 219(2) is more helpful. In particular, § 219(2) creates employer liability when (1) the master was negligent or reckless, Restatement (Second) of Agency § 219(2)(b) (1958), and (2) where the servant purported to act or to speak on behalf of the principal and there was reliance on apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." Restatement (Second) of Agency § 219(2)(d) (1958). In view of § 219 (2), and Hicks' allegations, Gates might be held liable for acts of sexual harassment committed by Gleason.

Accordingly we reject Gates' assertion of lack of notice as an absolute defense. On remand the company's liability for its supervisors' acts should be determined in light of the agency principles we have discussed.

## VI

### Evidentiary Rulings

■ We turn now to the claims of error in evidentiary rulings which should be considered before the remand is made.

The main evidentiary controversy concerns the admissibility of clock charts and daily reports. The clock charts are a mechanical record which records the key number punched at the exact time and location. A supervisor can then review the charts to determine the number of keys punched in a given period of time. IV R. 272. The daily reports contain notations made by the security guards while on duty. *Id.*

Prior to and during trial, Hicks vigorously objected to the introduction of the clock charts and daily reports noting her job performance and the performance of those security guards similarly situated. Hicks' basis for the objection was that the documents were selectively maintained in violation of 29 C.F.R. § 1602.14 (1983).[4] The regulation requires that an employer notified of a charge of discrimination preserve relevant personnel records until the charges' final disposition. *See EEOC v.*

---

4. Section 1602.14 provides:

(a) Any personnel or employment record made or kept by an employer (including but not necessarily limited to application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, lay-off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by the employer for a period of 6 months from the date of the making of the record or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of 6 months from the date of termination. Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against an employer under title VII, the respondent employer shall preserve all personnel records relevant to the charge or action until final disposition of the charge or the action. The term "personnel records relevant to the charge," for example, would include personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected. The date of "final disposition of the charge or the action" means the date of expiration of the statutory period within which the aggrieved person may bring an action in a U.S. District Court or, where an action is brought against an employer either by the aggrieved person, the Commission, or by the Attorney General, the date on which such litigation is terminated.

*Shell Oil Co.*, 466 U.S. 54, 78 and n. 35, 104 S.Ct. 1621, 1636 and n. 35, 80 L.Ed.2d 41 (1984); *EEOC v. The Great Atlantic & Pacific Tea Co.*, 735 F.2d 69, 72, 74 (3d Cir.), *cert. dismissed*, 469 U.S. 925, 105 S.Ct. 307, 83 L.Ed.2d 241 (1984).

Gates acknowledges that many of the clock charts and daily reports generated by the plaintiff and other security guards were destroyed pursuant to its routine business practices. Gates, however, argues that the documents were not "personnel or employment" records under § 1602.14, but rather "performance" records kept for insurance audit purposes. IV R. 275–76. The district court agreed, finding that the clock charts and daily reports sought to be introduced as evidence were not personnel records as set by company policy, that the documents were in fact not personnel records as defined by § 1602.14, and that the documents were kept for the purpose of gauging the performance of security guards with respect to the requirements of the insurance carrier. Thus the court concluded § 1602.14 did not apply to the preservation of the clock charts and daily reports. *Id.* at 304–05. We disagree.

The district court's finding that the clock charts and daily reports were used solely to gauge the performance of security guards with respect to the requirements of the insurance carrier was clearly erroneous. Jack Lee Ely, manager of security for Gates Rubber Company's Denver operations, testified that the clock charts and daily reports were routinely used for determining whether disciplinary action should be taken against a guard, IV R. 276, 277, 278, 280, and that the clock charts and daily reports were in fact relied on in disciplining and ultimately firing Hicks. IV R. 299–300, 306, 307, 328, 329, 333. The documents were "records having to do with ... demotion, ... or termination," 29 C.F. R. § 1602.14(a), and are thus personnel or employment records which should have been retained by Gates. Gates' argument that the clock charts and daily reports were

not personnel records as defined by § 1602.14(a) but records kept for insurance purposes is untenable in light of the testimony of its own witness. Therefore, we conclude that Gates violated the EEOC administrative requirement of the preservation of all records relevant to the claim.

We believe that because Gates violated § 1602.14 by destroying the personnel records,[5] Hicks is entitled to the benefit of a presumption that the destroyed documents would have bolstered her case. *See Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 661 n. 7 (5th Cir.1983), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1709, 80 L.Ed. 2d 182 (1984); *see also Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946). *See generally* 2 Wigmore, *Evidence* § 291 (Chadbourn rev.1979). Gates argues vigorously that any such presumption was convincingly rebutted by the record evidence. *See Capaci*, 711 F.2d at 661 n. 7. This should be determined by the district court on remand when the evidence is reconsidered in accord with the rulings made on this appeal.

We have considered the remaining evidentiary errors asserted by Hicks but find them to be without merit.

## VII

Accordingly, the judgment is reversed and the case is remanded for further proceedings in accord with this opinion. The district court should reconsider the present record and conduct any further hearings deemed necessary for the making of revised findings, conclusions and disposition of the cause on reconsideration of all of the claims.

IT IS SO ORDERED.

SETH, Circuit Judge, dissenting:

I must respectfully dissent from the majority opinion because I cannot accept the quotation in the majority opinion (slip opinion, page 1415) from *McKinney v. Dole*,

---

5. We observe that the record does not support the assertion that Gates acted in bad faith in destroying the documents. This is not the case where an employer has selectively retained certain self-serving documents and discarded the remainder in a particular time period.

765 F.2d 1129 (D.C.Cir.), as a definition or rule that we should follow in this circuit.

*McKinney v. Dole,* in my view, goes far beyond *Meritor Saving Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49, as to the breadth of Title VII, and in defining how pervasive the "unequal treatment" must be. The court of appeals in *McKinney v. Dole* in referring to "unequal treatment" stated that it must be "sufficiently patterned or pervasive." "Sufficiently" in referring to some generalized undefined condition does not seem to provide a useful standard and would seem to do violence to disparate treatment doctrines.

We are not here concerned with the general conditions in the marketplace but instead with whether the sexual harassment of the plaintiff caused a change in the plaintiff's conditions of employment and whether sexual harassment created an abusive environment.

The Supreme Court in *Meritor* states (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.)), by referring directly to sexual harassment of the plaintiff:

> "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' Respondent's allegations in this case—which include not only pervasive harassment but also criminal conduct of the most serious nature— are plainly sufficient to state a claim for 'hostile environment' sexual harassment."

The Supreme Court does not center on "unequal treatment" but on *sexual harassment of the plaintiff* with the consequences on *her* conditions of employment. It is all very specific.

In the case before us the trial court found that there had been two incidents involving the same male employee and plaintiff which had sexual implications. This was a finding of fact as to the working environment and does not approach the statement of the doctrine in *Meritor,* but would perhaps conform to the generalized statement in *McKinney v. Dole* which the majority would adopt instead.

On another point the majority agrees with the trial court's finding that the work environment was *not* openly hostile to black employees. However it directs the trial court on remand to aggregate "racial hostility" and "sexual hostility" in determining the pervasiveness of "the harassment." The opinion cites *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158. The majority also refers to *Jefferies v. Harris Cty. Community Action Ass'n,* 615 F.2d 1025 (5th Cir.). There are, of course, many cases wherein discrimination is alleged based on both sex and race and many where both have been found to exist. However, it is difficult to see how we could on remand aggregate "racial hostility" where none was found to exist with anything else. Here again the majority would have the trial court evaluate the impact of the overall working conditions arising from whatever cause rather than try the case as a sexual harassment case under *Meritor.*

The case as it now stands is not a combination of statutorily protected characteristics advanced as a subclass as in *Jefferies* nor as a "plus" case.

I would affirm the trial court in all respects.