CASSELL, District Judge
(sitting by designation), dissenting in part.
Before trying this case, the district judge pruned it down by granting summary judgment for Lufkin Industries on Herrera’s three weakest claims — an intentional infliction of emotional distress claim, a breach of contract claim, and a racially hostile work environment claim. The matter was then tried to a jury for eleven days, eight of which were devoted to the plaintiffs case. The jury found against Herrera and for Lufkin on all claims presented to it. The majority now sustains the jury verdict and agrees that the district court properly dismissed the emotional distress claims and the breach of contract claim. It nonetheless remands this case for what may end up being another eleven-day trial on one of Herrera’s marginal claims — the hostile work environment claim.
I dissent from this unnecessary remand. I agree with the district court that the isolated instances of harassment Herrera recites are not sufficient to create a jury question on this claim. I would therefore affirm the district court in all respects.
The District Court Properly Granted Summary Judgment on Herrera’s Hostile Work Environment Claim.
The majority reverses the district court’s decision to grant summary judgment on Herrera’s hostile work environment claim, stipulating that this issue “presents a close question.”[1] And the majority recognizes Herrera must present ev *691 idence of more than “ ‘a few isolated incidents of racial enmity’ or ‘sporadic racial slurs.’ ”[2] Instead, “ ‘there must be a steady barrage of opprobrious racial comments.’ ”[3]
While I agree with the majority that this issue is a close one, I concur with the district court’s decision to grant summary judgment. Before describing the instances of alleged harassment Herrera relies upon, it is important to review his working environment. Herrera admits that Lufkin was a rough-and-tumble oil field equipment business that was not the typical office setting. He testified, in response to a question regarding a coworker who said to him “fuck you,”
Q. [I]n the oil patch, people use [vulgar] language, correct?
A. Okay. Yes.
Q. In the shop, people use that kind of language — Lufkin shop, yes?
A. Yes. I — some of them do.[4]
He also testified:
Q. Have you ever told “Mexican” jokes or anything such as that?
A. That I may have done. I told a lot of jokes, but I don’t remember saying any Mexican jokes or black jokes, for that matter.
Q. Okay. You would not be extremely surprised that someone said, yes. I heard Lewis, Senior tell a joke with the reference to a Mexican in it, that would not be so out of the ordinary that you would be shocked?
A. I wouldn’t be shocked, no. I told a lot of jokes in my day. I don’t remember them.
Q. Sure. Okay. In fact, that happens in the work place, off color jokes and so forth are told?
A. Not in relation to anybody else. I don’t do that. Blacks or whites or religious, I don’t do that.
Q. Okay. But there are others that do that in the work place, don’t they?
A. Yeah. The oil field is very co[a]rse.
Q. Yeah. The oil patch has people—
A. It’s own language.[5]
With this general atmosphere in mind, the instances of alleged race-neutral harassment Herrera invokes are insufficient to justify a remand for a trial on his hostile work environment claim. Herrera worked under Moore for approximately four years. In his deposition, Herrera identified five specific instances of alleged harassment during those four years that unquestionably were linked to his race — on average, about one instance every nine or ten months. Moore once sent him a package of peanut brittle; attached to it was a note that read “Mexican peanut brittle.”[6] Herrera was twice asked to call on certain customers because they “liked Mexicans” or were themselves Hispanic.[7] Moore, who worked out-of-state, would call the Wyoming office and ask for Herrera by calling him “that Mexican” or “that fucking Mexican.”[8] Notably, Herrera does not allege that Moore said those things directly to him. Finally, Moore once had other employees tell Herrera not to “Mexican *692 ize” his work truck and to remove a cactus figurine from the truck’s antenna.
The majority seems to agree that these “several discrete incidents” are not sufficient to satisfy the requirements of our precedent for a hostile work environment claim. It finds support for Herrera’s claims, however, in “evidence of other ongoing harassment occurring during this entire four-year time period.”[9] On close examination, however, the evidence of any ongoing harassment is scanty. The majority relies upon Moore’s references to Herrera as “that Mexican” or sometimes, “that fucking Mexican” to other people. While these derogatory comments may have been ongoing (at least viewing the evidence favorably to Herrera), even the majority concedes that most of the remarks were never heard by Herrera. Instead, the majority agrees that Herrera’s coworkers passed along these remarks to him only “occasionally.”[10] And the record is undisputed that when the remarks were passed along, they were passed along by those trying to help Herrera, not harm him. For example, Cunningham warned Herrera to be wary of Moore because he was a bigot. It is hard to discern “pervasive” harassment when racial remarks were “occasionally” passed along by persons friendly to Herrera. Thus, I do not understand the majority to dispute the district court’s conclusion that Herrera’s “friends, knowing of these insults, largely concealed them from him.”[11] For example, the majority ventures only so far as to say that Herrera was not “completely unaware” of derogatory remarks made by Moore.[12]
To find a basis for reversal, the majority couples these remarks with other race-neutral incidents. Of course, our precedent requires us to view an employee’s work environment as a whole. But given the coarse environment that prevailed at Lufkin, these incidents do not combine to create a viable hostile work environment claim. Herrera alleges Moore refused to shake his hand; coworkers told him to “watch your ass” because Moore was a bigot; he was treated like a kid and yelled at, as was his son, by another Lufkin employee; coworkers swore at him and Luf-kin did nothing about it; he was audited and forced to produce receipts before he could be reimbursed for road trip expenses; he was “hindered” from doing his job and made to look incompetent; he had to drive his boss to the airport; and some coworkers started prying into his personal life and accused him of conducting side businesses.[13]
Given the atmosphere Mr. Herrera testified existed at Lufkin, these incidents (while deplorable, if they happened) cannot be viewed as indicia of pervasive racial discrimination. Vulgarity and other socially-unaeceptable behavior that might lead to termination in a typical office setting were commonplace in the oilfields. Since raucous race-neutral behavior permeated Herrera’s working environment, the conduct he describes above — even when yoked to the five unquestionably race-based inci *693 dents — -is not evidence Herrera’s work environment was permeated with discriminatory ridicule.
This result is required by our previous cases. For instance, in Bolden v. PRC Inc.,[14] we affirmed a district court’s grant of summary judgment where the plaintiff cited two incidents of overtly racial discrimination and twenty instances of race-neutral conduct during the last eighteen months of his employment.[15] And in Hicks v. Gates Rubber Co.,[16] we found that a district court’s bench trial ruling of no hostile environment was not clearly erroneous despite evidence of approximately nine incidents of harassment over a period of eight months.[17]
These cases reveal the continuing import of our prior holding that “Title VII is not a code of workplace conduct, nor was it ‘designed to bring about a magical transformation in the social mores of American workers.’ ”[18] As this court noted in Gross v. Burggraf Construction Co., “[s]peech that might be offensive or unacceptable in a prep school faculty meeting, or on the floor of Congress, is tolerated in other work environments.... ‘Title VII was not meant to — or can — change this.’ ”[19]
Conclusion
With these points in mind, I would affirm the district court’s decision to grant summary judgment on Herrera’s hostile work environment claim. To order an unnecessary remand on this single claim when all the other — and many far stronger — claims have been rejected wastes court and attorney time. I would also, like the majority, affirm the district court’s grant of judgment as a matter of law on Mr. Herrera’s intentional infliction of emotional distress claim, his breach of contract claim, and the discovery ruling. I therefore respectfully dissent, in part.

. Majority Op. at 683.

. Id. at 680 (quoting Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir.2005)).

. Id. (quoting Chavez, 397 F.3d at 832).

. Appellant App. at 167.

. Id. at 788 (emphasis added).

. Id. at 785.

. Id.

. Id.

. Majority Op. at 681.

. Id. at 682.

. Appellant App. at 954 (emphasis added). The majority does disagree with the district court's statement that "[t]he insults that were identified were never, according to the evidence before the Court, divulged to the plaintiff.” Id. (emphasis added). I think the district court intended to use the word "directed” rather than "divulged,” as the sentence quoted in text above makes clear. In any event, the majority agrees that the insults were never directed at Herrera.

. Majority Op. at 681 n.6.

. Appellant App. at 785-86.

. 43 F.3d 545 (10th Cir.1994).

. Id. at 549.

. 833 F.2d 1406 (10th Cir.1987).

. Id. at 1409-10.

. Chavez, 397 F.3d at 833 (quoting Cross v. Burggraf Constr. Co., 53 F.3d 1531, 1538 (10th Cir.1995)).

. 53 F.3d at 1538 (quoting Rabidue v. Osceola Ref. Co., 584 F.Supp. 419, 430 (E.D.Mich.1984)).