Crickett TINDALL and Jackie Phelan, Plaintiffs,

v.

HOUSING AUTHORITY OF the CITY OF FORT SMITH, ARKANSAS; Arch Glenn, Ellis Yoes, Ralph L. Conaway, Stuart Condren, and Robert L. Nunley, Commissioners of the City of Ft. Smith Housing Authority; David Hicks, Executive Director of the Ft. Smith Housing Authority; Guy Gallaher, Former Maintenance Director of the Ft. Smith Housing Authority; and Edward Dale Ingle, Maintenance Supervisor of the Ft. Smith Housing Authority, All in Their Official and Individual Capacities, Defendants.

Civ. No. 89–2252.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

Jan. 4, 1991.

Richard Quiggle and Jim Werner, Little Rock, Ark., for plaintiffs.

J. Leslie Evitts, III, Hardin, Jesson & Dawson, Ft. Smith, Ark., for defendants.

## MEMORANDUM OPINION

MORRIS SHEPPARD ARNOLD, District Judge.

This is a sex discrimination case brought under 42 U.S.C. § 2000e *et seq.* (Title VII) and, because defendants are creatures of or employees of a subdivision of the State of Arkansas, under 42 U.S.C. § 1983 as well. Plaintiffs, former employees of the Housing Authority of Fort Smith, Arkansas (FSHA), allege that defendants treated them differently from men in a number of ways that were adverse. The court will discuss the plaintiffs' cases separately, though some of the evidence adduced at trial is common to both.

### I.

Plaintiff Crickett Tindall charges that she was given more difficult work assignments than men who were similarly situated, that the men were instructed not to help her with particularly onerous tasks, that she was denied medical treatment (unlike her male counterparts), that her supervisor verbally abused her in ways that he did not abuse male employees, and that she was terminated on account of her sex. The court will address each allegation in turn.

### A.

Ms. Tindall asserts that she was given more difficult work assignments than the men and that the men were instructed not to help her with particularly onerous tasks. The court believes that Ms. Tindall was mistaken in her belief that her work assignments were more burdensome than her male counterparts. Defendants Dale Ingle and Guy Gallaher testified that work assignments were made on a rotating basis and that Ms. Tindall's assignments were no different from the men's, and the court found their testimony credible. Ms. Tindall has therefore not made out a *prima facie* case of sex discrimination by establishing disparate treatment. *See McDonnell Douglas v. Green*, 411 U.S. 792, 93

S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Ms. Tindall's claim that the men were told not to help her, but were not told not to help men similarly situated, must also fail in this case, because the court finds that she has not established a *prima facie* case of disparate treatment. The testimony on this point was conflicting: Mr. Earl Hudson, Mr. Pfeiffer, and Mr. David Watson, all employees of the FSHA at the relevant time, testified that Mr. Ingle never told them not to help the women; indeed, some of them testified that they did in fact help them when the circumstances required. Mr. Timmy Salokar, it is true, did testify that Mr. Ingle told him not to assist the women, as did Mr. Bo Cooper and Mr. John Earl Mayhan. But Mr. Mayhan told the opposite story when interviewed before trial. On balance, the court finds that, at best, it is impossible to tell who is telling the truth here and that therefore the claim fails on the ground that the plaintiff has not carried her burden of proof.

### B.

Ms. Tindall's claim concerning a denial of medical treatment can be shortly dealt with. While Ms. Tindall stated that she was denied treatment, her testimony in this respect was vague and unconvincing, especially on the question of whether men were treated differently. The court therefore holds against plaintiff on this aspect of her complaint.

### C.

■ Ms. Tindall's next allegation, namely that she was verbally abused on account of her sex, is probably the most troubling of all, in the sense that the credibility determination is probably the most difficult in the case. Ms. Tindall claims that defendant Gallaher told her when she was hired that she was "the property of the FSHA" and that he "would see how long she would last," remarks that Ms. Tindall, in context, said she thought were directed at and shaped by the fact that she was a woman. In other words, she argues that a man would not have been talked to in that fashion. One day while she was driving a tractor, she alleges, Mr. Ingle asked her: "What are you trying to prove? That you are better than men?" He also told her, she testified, that she and Ms. Phelan, her co-plaintiff, were stupid and that "women belonged at home, barefoot and pregnant, taking care of their man." One day, according to Ms. Tindall, Mr. Ingle told her that Ms. Phelan "looked better bouncing around on the tractor than I did," an evident reference to Ms. Phelan's breasts. Finally, Ms. Tindall stated that Mr. Ingle told her that she had "no business as a woman working" and that "she was taking a job away from a man." Though she asserted that she complained many times to defendant Guy Gallaher, Mr. Ingle's supervisor, of this verbal abuse, Mr. Gallaher laughed it off with the advice that Ms. Tindall ought to overlook it, that Mr. Ingle was young or having a bad day.

For his part, Mr. Ingle denied all of Ms. Tindall's material testimony. He simply states that it did not happen. Mr. Gallaher, with a memorable vehemence, denied categorically that Ms. Tindall ever made any report whatever to him of Mr. Ingle's offensive behavior. He testified that had Ms. Tindall complained he "would have fired that boy right there." Furthermore, it is undisputed that Ms. Tindall never complained to the Housing Authority director Mr. David Hicks about Mr. Ingle's treatment, even though the testimony was clear that he had an "open-door policy" and that plaintiff had many opportunities to voice a complaint but did not do so. Ms. Tindall says that Mr. Gallaher told her not to complain to Mr. Hicks, but Mr. Gallaher denies that altogether.

Though Mr. Gallaher's testimony on cross-examination was more than a little confused (he is suffering from an illness that sometimes makes him incoherent), the court is of the view that his testimony that Ms. Tindall did not complain to him was credible. That finding casts doubt on all of Ms. Tindall's testimony to the extent that the court is regrettably constrained to say that it cannot accept it. The court there-

fore holds against Ms. Tindall on her verbal abuse claim.

### D.

Finally, the court turns to Ms. Tindall's claim that she was terminated on account of her sex. Her argument seems to be that she was terminated because she was complaining about the discriminatory treatment meted out to her and that since she would not have been treated disparately had she not been a woman, her termination was on account of her sex. The court finds otherwise. Mr. Gallaher testified that he fired her for her work performance and the written record (PX no. 39) reflects that she was terminated for failure to perform work as assigned. The court found this testimony entirely credible and notes, too, that it has already found as a fact that Ms. Tindall did not complain to Mr. Gallaher of Mr. Ingle's conduct.

### II.

The court turns next to a consideration of Ms. Phelan's claims. She has asserted that she was sexually harassed in ways similar to those that were claimed by Ms. Tindall, that she was removed from daytime service calls and extra hour service calls and males were not, that she was denied the overtime that males got, and that she was constructively discharged by Mr. David Hicks for filing an EEOC complaint. The court will examine each of these claims in turn.

### A.

The court first turns to an evaluation of Ms. Phelan's charges of sexual harassment. She asserts that Mr. Ingle told sexual jokes, made sexual comments about her breasts, told her that he wanted to touch her breasts and buttocks, and in fact did touch her neck and buttocks and tried to touch her breasts. He also gave her numerous sexual cartoons, she said, some of which she introduced into evidence.

The court begins its consideration of this phase of the case with the observation that it believes it to be the law that activities like touching, telling sexual jokes, and circulating cartoons of a sexual character, at least if they are directed at women for sexual purposes, and not at men, can form the basis of a complaint for sex discrimination under Title VII. The court also assumes that in order for such activities to be actionable, they must have been unwanted by and offensive to the person making the claim. It may also be that a plaintiff must likewise establish that it must have been apparent to the perpetrator of the offensive conduct that the conduct was unwanted and offensive, either from the nature of the conduct or the actions of the complainant; but because of the view taken by the court of this case it is not necessary to decide this point. Sexual harassment of a physical character can manifestly be a discrimination on account of sex. The court is clear, moreover, that the same is true of telling sexual jokes and displaying sexual cartoons, for under many circumstances an objectively reasonable woman would be justified in viewing these as a variety of incipient sexual assault. The cartoons introduced into evidence were exceptionally ugly and rude.

Like Ms. Tindall, Ms. Phelan testified that she told Mr. Gallaher about Mr. Ingle's alleged activities and that he told her that he would talk to Mr. Ingle about it, but that Mr. Ingle's behavior did not change. Mr. Gallaher, however, very forcefully denied that she approached him on the subject at all. Contrary to what Ms. Phelan asserted, Mr. Gallaher stated that she never showed him any of the cartoons that she allegedly received from Mr. Ingle. When showed one of the cartoons, he testified: "I am Chaplain of Post 31, American Legion, and I would not look at such a thing as that." Furthermore, he stated that Ms. Phelan never said anything about touching or grabbing her. "Dale [Ingle] would have known right off that I would have fired him if that had happened," he said. The court finds Mr. Gallaher's testimony credible. As was the case with Ms. Tindall's claims, this finding casts doubt on all of Ms. Phelan's testimony.

There are other reasons to doubt her testimony. For instance, Ms. Phelan testified that there were many occasions when Mr. Ingle touched her in the presence of witnesses, but in fact she produced no one who was able to corroborate her. The closest to corroboration that any witness came was when Mr. Bo Cooper said that he thought he saw Mr. Ingle "rub up against" Ms. Phelan and that Mr. Ingle "might have patted her on the bottom." Of course, the court is far from suggesting that a plaintiff claiming sexual harassment must produce corroborating evidence in order to prevail. In the nature of things, sexual harassment is very frequently a secret activity, carried on without the potential embarrassment that onlookers might provide. But when a plaintiff in fact asserts that there were witnesses and then does not produce them, a reasonable fact-finder is justified in doubting the plaintiff's credibility.

■ With respect to this aspect of the case, it has also proved important to the court's finding that one of the cartoons that Mr. Ingle allegedly gave Ms. Phelan portrays Mr. Ingle in a most unflattering and unfavorable light, indeed one so demeaning that it is impossible to believe that he would have given it to Ms. Phelan in the condition in which it was introduced into evidence. Nor can the fact that Ms. Phelan kept the cartoons that Mr. Ingle gave her give weight to her assertion that they offended her. There were certainly rude, lewd, and ugly pictures, as the court has noted, and a reasonable person would certainly be entitled to be offended by them, especially if such a person believed them to be a kind of sexual suggestion directed at him or her in particular. But one of the women who testified at the trial simply laughed at even the crudest of these pictures and said that they did not bother her at all. The court does not have to, indeed ought not to pretend that it does not know what everyone else knows, and the truth is that there are workplaces where considerable sexual horseplay of a low-level and consensual nature occurs among certain of the workers. Even if the court believed, then, that Mr. Ingle gave these cartoons to Ms. Phelan, it would be inclined to think, on this record, that she was not offended by them. This conclusion is reinforced by the court's observation of her on the witness stand when she quite freely and without apparent reservation or embarrassment repeated some very crude and lewd remarks that had allegedly been made to her. The court does not make this last observation by way of criticism but merely as a way of indicating how a reasonable fact-finder might conclude that Ms. Phelan was not offended by the cartoons even if the same fact-finder were to conclude that Mr. Ingle had given them to her. Some of the witnesses testified, moreover, that Ms. Phelan acted like "one of the boys" and freely joined in sexual jokes with the men.

### B.

■ Ms. Phelan also makes numerous claims that she was discriminated against on account of her sex in her job assignments. First, she asserts that she was removed from daytime service calls. Mr. Ingle testified, on the other hand, that this was simply in keeping with the new departmental policy that he initiated to assign employees to different jobs to contribute to their training. Plaintiff Phelan likewise claims that she was discriminated against when she was not allowed to continue to do all the after-hour service calls. Mr. Ingle, on the other hand, testified that he simply instituted a practice of rotating these calls, evidently to spread out the overtime. Thirdly, Ms. Phelan asserts that she was removed entirely from after-hours service calls on account of her sex. In this instance, Mr. Ingle testified that she was removed because she had allowed an unauthorized person, namely Crickett Tindall, to accompany her on such calls. While this seems a rather thin basis for an employment decision, there was testimony from other workers that there was a definite rule against such activities as those Ms. Phelan engaged in. Finally, Ms. Phelan, like Ms. Tindall, claims that Mr. Ingle, or Mr. Gallaher, or both, told her male co-workers not to help her. The court credits Mr. Ingle's testimony in this case and also

finds that Ms. Phelan has failed to carry her burden of proof on her claim that her coworkers were instructed not to help her. The court therefore finds for the defendants on Ms. Phelan's claims of sex-based work assignments.

### C.

 Perhaps the most complex of Ms. Phelan's complaints is that she was constructively discharged from her job because she filed an EEOC complaint against her employer. It is undisputed that she did file such a complaint and that she later resigned, she says under a kind of duress, and so this claim has a kind of *prima facie* plausibility to it. Even if those facts could establish a *prima facie* case in the technical sense, the court finds that the defendants have proved that their actions surrounding Ms. Phelan's termination were in no manner affected by a sex-based animus. In order to comprehend this part of the case, it is necessary to descend to a rather refined level of detail.

In October of 1987, Ms. Phelan, who had previously suffered from carpal tunnel syndrome, suffered a work-related injury to her wrists. Dr. A.B. Hathcock treated her for this injury, and recommended that she not work for a time to give her needed time for healing. Mr. David Hicks of the FSHA testified that he would not allow Ms. Phelan to return to work until she was fully recovered and would not give her a light duty assignment because there was no such classification available to FSHA workers. The testimony further reveals that on December 11, 1987, a much-discussed meeting took place at which Mr. David Hicks, Mr. Dale Ingle, and Mrs. Helen Phillips (all these of FSHA) and Ms. Phelan were present. Dr. Hathcock had released Ms. Phelan for full employment by that time, but, according to Mr. Hicks, Ms. Phelan told them that she was nevertheless unable to go back to work at that time. (Ms. Phelan's testimony corroborates the statements of Mr. Hicks in this respect). The subject of Ms. Phelan's EEOC complaint did come up at this meeting, but no threats about it were made. Ms. Phelan did not go back to work. Some months later, Ms. Phelan again met with Mr. Hicks and this time asked him to return her to work. Mr. Hicks refused to do so, he says on the ground that he did not believe that Ms. Phelan was physically ready to go back to work.

Mr. Hicks testified directly and unequivocally under oath that he was keenly aware of his EEO responsibilities and that Ms. Phelan's EEOC complaint played no part whatever in his decision not to put Ms. Phelan back to work. The court credits his testimony and finds against Ms. Phelan on this aspect of her complaint.

### III.

In short, the court finds against plaintiffs in all respects and will therefore enter judgment for defendants.