Carla CAMPBELL, Plaintiff,

v.

KANSAS STATE UNIVERSITY, and Charles Deyoe, Defendants.

Civ. A. No. 88–1710–T.

United States District Court, D. Kansas.

Dec. 18, 1991.

Donna J. Long, Ryan and Ryan, P.A., Clay Center, Kan., for plaintiff.

Dorothy L. Thompson, Manhattan, Kan., for defendants.

### MEMORANDUM AND ORDER

THEIS, District Judge.

This matter comes before the court for final disposition after a six-day bench trial. Carla Campbell, the plaintiff, brings this action against Dr. Charles Deyoe and Kansas State University[1] under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging "hostile environment" sexual harassment, retaliation, and constructive discharge. In addition, the plaintiff presents pendent state claims

---

1. Prior to trial, plaintiff dismissed the Board of Regents of the state of Kansas and June Bishop as defendants.

based on battery and assault against Deyoe. Having reviewed all the evidence presented at trial and considered the credibility and demeanor of the witnesses, the court, in conformity with Fed.R.Civ.P. 52(a), makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

Plaintiff Campbell is a 39 year-old woman formerly employed by Kansas State University in the Department of Grain Science ("the Department"), a department within the College of Agriculture. Dr. Charles Deyoe, the principal defendant, is the Head of the Department of Grain Science.

Plaintiff initially worked in the Department as a Word Processor II, a classified position,[2] for Dr. Keith Behnke. In June 1986, the plaintiff was recruited by June Bishop, the Office Supervisor, to work for defendant Charles Deyoe after Kim Hoffman, Deyoe's former secretary, resigned. Deyoe originally hired the plaintiff as a "Research Assistant" but her job title was later changed to "Administrative Assistant." Her job as Administrative Assistant, an unclassified position, required the plaintiff to perform secretarial duties coupled with additional responsibilities such as organization and scheduling of the departmental agenda. (Jnt.Exh. 43, p. 6). According to the plaintiff's employment contract, her appointment "carries with it no expectation of continuing employment and no consideration for tenure." (Jnt.Exh. 20). After the plaintiff's original one-year appointment expired, she was reappointed for an additional term beginning on June 18, 1987 and ending on June 17, 1988.

Charles Deyoe's sexually abusive conduct emerged even before the plaintiff began working for him. During Kim Hoffman's tenure as Deyoe's secretary, Deyoe and Hoffman occasionally exchanged jokes, some of which were mildly sexually explicit. However, on more than one occasion, Deyoe—for no apparent reason—announced to Hoffman that he felt like he needed to hit her on the buttocks. He also sometimes asked Hoffman what she would do if he hit her on the buttocks. Although Hoffman felt uncomfortable over Deyoe's "weird" and "stupid" remarks, she did not feel threatened because she thought he was not serious but was merely "being silly." In another incident, when confronted with a disciplinary problem involving Kathy Foster, a linguist in the Department, Deyoe exclaimed to Hoffman, "Well, what should I do—sleep with her?" as a suggested response to the problem. (Jnt.Exh. 44, p. 27).

On March 24, 1986, Hoffman had a conversation with Deyoe concerning her request for time off to attend the Kansas Artificial Insemination School; Hoffman ran a cattle breeding business with her husband. During this conversation, Deyoe joked about artificial insemination and proceeded to ask Hoffman whether she would "prefer it artificially or the natural way," referring to Hoffman's sexual preferences. Deyoe later looked straight at Hoffman and declared, "I'm going to inseminate you!" (Jnt.Exh. 44, p. 26).

Deyoe's remarks caused Hoffman great distress, and prompted her to tell a fellow worker, Cathy Tilley, that she was unable to work with Deyoe any longer. On the following day, Hoffman related the incident to June Bishop, her supervisor. Hoffman, however, specifically requested Bishop not to say anything to Deyoe. June Bishop failed to do anything to pursue Hoffman's complaint except to talk to Deyoe about the incident. Deyoe apologized to Hoffman for making her feel uncomfortable. A short time later, Hoffman left Deyoe's employ.

When the plaintiff replaced Hoffman in June 1986, she was unaware of the circumstances surrounding Hoffman's resignation. In the course of the plaintiff's employment, Deyoe occasionally told her that he would slap her on the buttocks. Plaintiff, however, considered those remarks

---

**2.** Classified positions at Kansas State University are subject to the Kansas Civil Service System whereas unclassified positions are subject to contract provisions pursuant to University rules and policies.

"hilarious and stupid" and did not feel threatened at the time.

On December 22, 1987, in Room 03K Shellenberger Hall, Deyoe slapped the plaintiff on her buttocks as she was leaving the room after delivering a message to him. The physical contact was hard enough to make her flesh sting. Plaintiff was extremely shocked and upset, and told Deyoe, "If you don't do that again, I won't tell your wife!" Plaintiff subsequently told June Bishop, the Office Supervisor at the time, about the incident. Plaintiff also related the incident to several other people, including Debi Rogers, Sally Routson and Dr. Keith Behnke.

In January 1988, Deyoe again said that he would hit the plaintiff on the buttocks. This time, however, the plaintiff felt threatened because she no longer considered his remarks frivolous.

As a result of Deyoe's behavior, the plaintiff suffered severe emotional and psychological distress, and required counseling. Plaintiff also manifested physiological symptoms, such as headaches, sleep difficulty and stress-reaction diarrhea. (Testimony of Dr. Lambert). Plaintiff incurred $77 in psychiatric expenses in connection with the stress from the harassment incident.

Although the plaintiff also claimed that Deyoe made knee contacts with her below the conference table and crowded her in her office space, the court finds that these incidents were purely inadvertent. Plaintiff herself testified that Deyoe was a large man, and that any knee contact could have been accidental. Her office space was also very limited and would make any physical crowding inevitable. (Jnt.Exh. 35).

The court also finds that Deyoe's use of obscenities did not cause the plaintiff any distress. Deyoe occasionally remarked in the plaintiff's presence that he had a particular person "by the balls." Those remarks were not directed at the plaintiff. Nor were they derogatory to women. Plaintiff herself occasionally used expletives at work that were perhaps more profane than Deyoe's utterances.

On February 2, 1988, Dean Walter Woods, Dean of the College of Agriculture, received the plaintiff's sexual harassment complaint against Deyoe. On February 18, 1988, after Dean Woods returned from a business trip abroad, he met with the plaintiff to hear her complaint. In investigating the plaintiff's claim, Dean Woods talked to June Bishop, Deanna Selby and Professor Keith Behnke; he did not interview Kim Hoffman or Debi Rogers, although the plaintiff had supplied him with their names. Dean Woods concluded that he was unable to determine that sexual harassment had in fact occurred because the individuals whom he interviewed did not corroborate with the plaintiff on the actual date in which the alleged incident was related to them: Bishop and Selby denied that it was on December 22, 1988 or thereabouts that the plaintiff told them about the slap on her buttocks. However, all three individuals whom Dean Woods interviewed had told him that the plaintiff *did* tell them she was slapped on the buttocks by Deyoe; they merely disagreed with the plaintiff as to *when* she told them. In his letter of administrative resolution, Dean Woods urged Deyoe to "continue to be professional in his behavior," and to pay special attention that his conduct not appear as sexually harassing. Dean Woods also exhorted Deyoe to review carefully the University's policy on sexual harassment. (Jnt.Exh. 9).

Plaintiff subsequently brought a formal complaint to the Discrimination Review Committee at the University. Plaintiff then requested leave without pay because she felt "unable to continue to work in the present work environment." (Jnt.Exh. 43, p. 3). Deyoe granted the plaintiff's request but stated that her current appointment would terminate on June 17, 1988 in accordance with her employment contract. (Jnt. Exh. 43, p. 2).

A hearing was conducted on May 5, 1988. The Committee found "insufficient evidence to establish that the alleged 22 December 1987 incident actually occurred." (Jnt.Exh. 45). On the plaintiff's retaliation claim, however, the Committee found that there was hostility in the work environ-

ment, which escalated after the plaintiff filed her complaint.

Notwithstanding the Committee's findings, the court finds that the plaintiff herself was at least equally responsible for the hostility within the workplace after she filed her complaint. Plaintiff frequently refused to speak or cooperate with her co-workers at the Department. On one occasion, the plaintiff yelled at a fellow employee when asked about Deyoe's whereabouts. Plaintiff also yelled at another employee, Marcia Longburn, and unreasonably called her "incompetent" when they worked on some mailings. Towards the end of her employment at Grain Science, the plaintiff became so unresponsive and unapproachable that Deyoe found it easier to channel her work to others or to do it himself. While the court recognizes that the plaintiff was not solely responsible for any hostility resulting from the filing of her complaint, the court finds no factual preponderance of the evidence indicating that the defendants retaliated against the plaintiff.

In view of the plaintiff's decision not to continue working in the Grain Science Department, Dean Woods offered to transfer the plaintiff to the Dean's office for the remainder of her 1987–88 contract. Plaintiff's pay would not change and her vacation time would be restored. Plaintiff, however, declined the offer, citing her emotional difficulties in returning to the College of Agriculture. (Jnt.Exh. 51).

On June 16, 1988, Dean Woods notified the plaintiff of a job opportunity as an Administrative Assistant in the University Library. The position was for a one-year term, beginning on June 18, 1988, the day after the expiration of the plaintiff's Grain Science contract. Dean Woods instructed the plaintiff to contact Dean Hobrock, Dean of Library, who would prepare the contract and inform her of the job duties. (Jnt.Exh. 52). Plaintiff attended an interview with Dean Hobrock and his staff to discuss the position. Plaintiff later declined the position because Dean Hobrock and his staff had asked the plaintiff questions relating to her sexual harassment claim and because the position was merely a one-year appointment.

The court finds that the plaintiff's rejection of the Library position was unreasonable. While it is true that Dean Hobrock and his staff inquired into the plaintiff's sexual harassment complaint, their inquiries were initiated by the plaintiff herself and were reasonably based on concerns over the plaintiff's future job performance. Moreover, the Library position was equivalent to the plaintiff's former appointment at the Grain Science Department. Like the Library position, the plaintiff's position at Grain Science was a one-year appointment. Although the plaintiff expected her Grain Science employment contract to be renewed, the University had made no guarantee or representation that her contract would automatically be renewed. Plaintiff has also failed to show the court that there was absolutely no possibility of contract renewal for the Library position. In fact, the same library position that the plaintiff declined had been extended six months beyond the original one-year term. Further, Dean Hobrock had assured the plaintiff that, "if things work out well," the plaintiff could move into more extended positions at the end of the appointment.

After turning down the Library position, the plaintiff made several unsuccessful attempts at securing employment in the Manhattan area. In November 1988, five months after her contract with Grain Science expired, the plaintiff secured what she considered a "perfect position" with the U.S. Fish and Wildlife Service. She has worked there continuously except for a six month hiatus between January 1989 and July 1989, during which period the plaintiff made no effort to find employment.

Plaintiff's position at the U.S. Fish and Wildlife Service was technically listed as part-time but she was allowed to work full-time hours if she desired. Plaintiff worked solely on a part-time basis throughout her employment with the Service. (Plt.Exh. 6). The court finds, therefore, that the plaintiff's part-time employment status was the

result of a voluntary and conscious decision on her part.[3]

In March 1989, Kansas State University contacted plaintiff to interview for a Secretary III position. Plaintiff declined the invitation because "she was not in a position at this time to interview" for the position. (Def.Exh. 2). Instead, the plaintiff secured a low-paying assistantship position in the Political Science department. The evidence again points to the plaintiff's voluntary decision to choose part-time over full-time positions during this period.

Plaintiff has exhausted her administrative remedies. She lodged a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Kansas Commission on Civil Rights on June 15, 1988. After an administrative determination of no probable cause, the plaintiff properly invoked the court's jurisdiction under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

## CONCLUSIONS OF LAW

### 1. SEXUAL HARASSMENT

■ Title VII proscribes sexual harassment in the workplace. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Although sexual harassment may surface in a variety of forms, courts have consistently recognized two distinct categories of sexual harassment claims: *quid pro quo* harassment and hostile environment harassment. *Hicks v. Gates Rubber Co.,* 833 F.2d 1406 (10th Cir.1987). *Quid pro quo* sexual harassment takes place when sexual favors are coerced in exchange for employment benefits. *See, e.g., EEOC v. Domino's Pizza, Inc.,* 34 Fair Empl.Prac.Cas. (BNA) 1075, 1983 WL 477 (E.D.Mich.1983) (plaintiff was fired for refusing to accede to manager's sexual demands). Alternatively, a sexual harassment claim based on hostile environment, which the plaintiff presents in the instant case, arises when sexual conduct " 'has the purpose or effect of unreasonably interfering with an individual's work

performance or creating an intimidating, hostile, or offensive working environment.' " *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404 (quoting 29 C.F.R. § 1604.11(a)(3) (1986)). The predicate conduct underlying a sexual harassment claim need not be sexual or prurient in nature; the conduct need only be gender-based, occurring simply because of the victim's gender. *See Hicks,* 833 F.2d at 1415 (conduct that would not occur but for the employee's sex may be actionable under Title VII); *e.g., Hall v. Gus Constr. Co., Inc.,* 842 F.2d 1010, 1013–14 (8th Cir.1988) (male crew members urinated into the gas tank of female employee's car).

■ For a hostile environment claim to be actionable, the sexual harassment must be "sufficiently pervasive or severe 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). Whether the sexual harassment is sufficiently pervasive or severe to create a hostile working environment must be determined from the totality of the circumstances. *Henson,* 682 F.2d at 904.

■ Because this court has discounted the plaintiff's claims of knee contacts, profane utterances and physical crowding in her office space, what remains of the plaintiff's sexual harassment claim is predicated on a slap on the plaintiff's buttocks coupled with Deyoe's subsequent threat of repeating the act, which instilled fear in the plaintiff. At issue, therefore, is whether a supervisor's act of slapping a female employee on her buttocks and his subsequent verbal threat to continue the offensive physical contact amount to the level of pervasiveness or severity required in a hostile environment claim.

The courts have not been entirely consistent in determining the threshold of pervasive or severe conduct necessary to maintain a hostile environment claim. Some

---

**3.** In addition, the plaintiff's psychologist, Dr. Lambert, testified that the plaintiff informed her that, after the harassment incident, the plaintiff did not intend to work within the University system again.

courts recognize that activities involving unwelcome physical touching can form the basis of a Title VII claim. *See, e.g., Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577–78 (2d Cir.1989) (hostile environment existed where supervisor fondled plaintiff's knee and kissed her neck); *Tindall v. Housing Auth. of City of Fort Smith*, 762 F.Supp. 259, 262 (W.D.Ark. 1991) ("Sexual harassment of a physical character can manifestly be a discrimination on account of sex."). Other courts, however, require more eggregious behavior to support a hostile environment claim. In *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210 (7th Cir.1986), for example, the Seventh Circuit held that the plaintiff's working environment was not sufficiently hostile notwithstanding the fact that the plaintiff was slapped on her buttocks and asked if she moaned and groaned during sexual intercourse; according to the *Scott* court, the offensive conduct was not "repeated or relentless." *Id.* at 212.

█ While it is true that "casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action," *Hicks*, 833 F.2d at 1414 (citations omitted), it does not necessarily follow that the complained-of behavior must invariably be repeated and relentless. Although repeated and relentless conduct is probative of the pervasiveness of the harassment, this court is mindful that the Supreme Court in *Vinson* required that the harassment be "sufficiently pervasive *or* severe." (Emphasis added.) As such, a single isolated incident—while perhaps not pervasive—may nevertheless be so severe as to amount to an actionable violation of Title VII. *See Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir.1991) ("the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct"); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir.1990) ("The factfinder must not only look to the frequency of the incidents but to their gravity as well."); *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 578 (2d Cir.1989) ("It is not how long the [harassing conduct] lasts. The offensive-

ness of the individual actions complained of is also a factor...."); *Ross v. Double Diamond, Inc.*, 672 F.Supp. 261 (N.D.Tex.1987) (the severity of the harassment satisfied the "pervasive or severe" test even though the harassment lasted only a short time). Therefore, rather than anchoring the analysis on the frequency or longevity of the conduct, the main focus should be on the adverse effects of the conduct: whether the harassment interfered with plaintiff's work performance or created an "intimidating, hostile or offensive" working environment. *Vinson*, 477 U.S. at 65, 106 S.Ct. at 2404 (citing 29 C.F.R. § 1604.11(a)(3)).

The present case involves more than mere utterance of an epithet. Without provocation or reason, the plaintiff—a dignified adult woman—was spanked on her rear end! In addition, the plaintiff subsequently faced a threat that the spanking might be repeated, and she felt genuine apprehension. Deyoe's conduct was unwelcome, and prompted simply because of the plaintiff's gender. Considering the nature of Deyoe's behavior, and the context in which it arose, the court is convinced that Deyoe's behavior was patently abusive and offensive—even though it happened infrequently and for a short period. Deyoe's behavior robbed the plaintiff of her self-esteem at the workplace; she was demeaned, degraded and humiliated. After those incidents, the plaintiff's psychological well-being and work performance were adversely affected in a significant manner. In the court's view, a reasonable person in the plaintiff's position would suffer the same humiliation and distress. In this day of heightened sensitivity to sexual harassment and a woman's rights in the workplace, this court finds the defendant's behavior wholly unacceptable and sufficiently severe to constitute actionable sexual harassment.

█ Having determined that Deyoe's conduct amounts to sexual harassment, the next issue is whether the employer, Kansas State University, may be held liable for the transgressions of Dr. Deyoe, a member of its supervisory personnel. In *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th

Cir.1987), the Tenth Circuit identified three alternative bases for imputing liability to an employer for the acts of a supervisor. Drawing upon § 219 of the Restatement (Second) of Agency, *Hicks* imposes employer liability for a supervisor's hostile environment harassment where (1) the supervisor was acting within the scope of his employment; (2) the employer was negligent or reckless; or (3) the supervisor purported to act on behalf of the employer and there was apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation. *Id.* at 1417–18.

The "scope of employment" basis for liability is largely inapposite in sexual harassment cases because harassing an employee is seldom within the job description of a supervisor in any business of good repute. *Id. But see Sims v. Montgomery County Comm'n.*, 766 F.Supp. 1052, 1075 (M.D.Ala. 1990) (employer had policy of discouraging women from remaining in the department and seeking advancement, and sexual harassment was simply a way of furthering that policy "by making it as uncomfortable and unpleasant as possible for women to remain as officers in the department"). In the present case, Deyoe's job duties certainly did not include slapping his administrative assistant on the buttocks or making a threat to that effect. The express prohibitions against sexual harassment outlined by the University certainly compels a finding that Deyoe acted outside the scope of employment. The University's liability may not hinge, therefore, upon the "scope of employment" rationale.

However, the second theory—employer negligence or recklessness—provides a basis for employer liability in this case. Under the second agency theory, employer liability attaches when the employer is negligent or reckless in failing to respond to hostile environment harassment by its employees. *Id.* at 1418. An employer is deemed negligent or reckless in this context when it fails to "remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *Hirschfeld v. New Mexico Corrections Dept.*, 916 F.2d 572 (10th Cir.

1990) (quoting *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1516 (9th Cir.1989)). This theory, thus, demands a two-prong inquiry: whether the employer had actual or constructive knowledge of the harassment; and, if so, whether the employer failed to remedy or prevent the violation.

The court concludes, first, that Kansas State University had knowledge of Deyoe's harassing behavior. As early as March 1986, June Bishop, the office supervisor, was informed of Deyoe's harassing conduct by Kim Hoffman, the former secretary. *See Henson*, 682 F.2d at 905 (employer is charged with knowledge of the harassment when plaintiff complained to higher management). Although June Bishop may not be a "management-level" employee, her knowledge of Deyoe's actions is chargeable to the University. The University has expressly delegated the responsibility of patrolling sexual harassment problems to its supervisors, of which June Bishop was one, and to administrators. According to the University policy:

> it is the obligation of supervisors and administrators to prevent sexual harassment from occurring or continuing. To that end, it is essential that administrators and supervisors become aware of the nature of sexual harassment and fully familiar with the University's "Policy Prohibiting Sexual Harassment," and that they transmit this information to those faculty and staff in their areas of responsibility.

(Jnt.Exh. 4). The University may not, therefore, disclaim any knowledge of Deyoe's harassment when that very knowledge was possessed by the personnel on whom the University had placed responsibility for sexual harassment claims. To hold otherwise would provide employers with a convenient method of insulating themselves from liability.

The court concludes also that the University failed to take reasonable corrective action to remedy the situation or prevent it from recurring. With respect to Kim Hoffman's complaint, June Bishop merely related the complaint to Deyoe, the transgressor. Except for a voluntary apology by

Deyoe to Hoffman, nothing was done to remedy the situation or to prevent the harassment from recurring. The University undertook no disciplinary action against Deyoe, not even a mere warning. Kim Hoffman was never told of the possibility of invoking the University's administrative procedure. Given the knowledge that the University possessed through June Bishop, the University failed to prevent Deyoe from later victimizing another employee, who turned out to be Carla Campbell.[4] The University's liability is, therefore, premised on its failure to prevent Deyoe from harassing the plaintiff after having prior notice of Deyoe's inappropriate behavior towards Kim Hoffman.[5]

■ Although the plaintiff also argued that the University's response to the plaintiff's complaint was inadequate, the court cannot agree. The University has a comprehensive administrative mechanism for handling sexual harassment claims. The court is somewhat dissatisfied with the manner in which Dean Woods conducted the investigation of the plaintiff's complaint: he failed to interview Kim Hoffman, a key witness, and concluded that he was unable to find sexual harassment simply because the witnesses failed to corroborate on the exact dates of the alleged incident. Notwithstanding Dean Woods' imperfect investigation, the court cannot say that the investigation was so deficient as to be utterly meaningless and inadequate. Plaintiff also had an opportunity to present her case before a full administrative tribunal. The evidence shows that, after the plaintiff invoked the grievance procedure, the University's response was prompt, reasonable and adequate.

■ Apart from the court's conclusion that the University was negligent in failing to prevent the harassment from happening to the plaintiff, the court also finds an alternative basis for employer liability. Deyoe, as the Head of Department, was a high-level administrator. Deyoe had direct supervisory authority over the plaintiff and other staff members in the Department. He possessed sufficient authority to characterize his actions as acts of the "employer" within § 701(b) of Title VII. *See* Mack A. Player, *Employment Discrimination Law* 254 (practitioner's ed. 1988). Without even resorting to agency principles, then, the court concludes that the University is liable for Deyoe's actions: his acts are tantamount to those of the employer. Sexual harassment by the Head of Department is, thus, harassment by the University itself. Such an interpretation is consistent with the broad definition of "employer" in Title VII so as to effectuate the remedial and public policy goals of the Civil Rights Act of 1964.

## 2. RETALIATION

■ Title VII makes it unlawful "for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this, or because he has made a charge, testified, asserted, or participated in any manner in an investigation, proceed-

---

4. The evidence did not show, and left the finder of fact only to speculate, whether Bishop's reticence to act on the harassment complaints was motivated by loyalty to Deyoe, disbelief in or disdain for the complainant, or fear of retaliation for her husband, who held a supervisory position in Maintenace at Kansas State University.

5. Because the court concludes that employer liability may be anchored on the negligence theory, the court does not address whether the University's liability may also be premised on the third agency theory—apparent authority or acts aided by the existence of the agency relationship. The court notes in passing, however, that this theory may apply more readily in *quid pro quo* cases than in hostile environment cases.

A sexual harasser in a *quid pro quo* case would normally need the existence of the agency relationship to barter for sexual favors. A hostile environment, on the other hand, can be created with or without the aid of the agency relationship. Moreover, unlike *quid pro quo* harassment, the existence of a hostile environment is usually not necessarily attributable to the employer's delegation of authority to the harasser. *See, e.g., Fields v. Horizon House, Inc.,* No. CIV. A. 86–4343, 1987 WL 26652, at *4 (E.D.Pa. Dec. 9, 1987); *see also Andresen v. McDonnell Douglas Corp.,* No. CIV. A. 89–C–0163–S, 1991 WL 96053, at *3 (D.Utah Feb. 21, 1991) (it is not enough that the workplace setting provided the occasion or opportunity for the supervisor to harass the plaintiff).

ing, or hearing under this title." 42 U.S.C. § 2000e–3(a). To make a prima facie case of retaliation, the plaintiff must show that (1) she engaged in protected opposition to discrimination or participated in Title VII proceedings; (2) she suffered adverse employment action subsequent to the protected activity; and (3) her protected activity and the adverse employment action were causally related. *Archuleta v. Colorado Dep't of Institutions*, 936 F.2d 483, 486 (10th Cir.1991).

■ Plaintiff claims that, after she initiated her sexual harassment complaint with the University, Deyoe and June Bishop embarked on a series of actions that eroded her effectiveness on the job and caused such hostility that she was forced to take unpaid leave: they refused to communicate with her and channeled her work elsewhere. In addition, the plaintiff asserts that Deyoe refused to renew her employment contract in retaliation for her complaint.

The court concludes that the plaintiff has failed to show that she was subjected to retaliation for filing her complaint. The lack of communication between Deyoe and the plaintiff at worst evinces Deyoe's awkwardness and discomfort in working with the plaintiff after she had filed a complaint against him. Any hostility that might have entered into their professional relationship was not the result of a retaliatory motive on Deyoe's part. Plaintiff herself must share the blame for the strained relationships at the workplace; she was uncooperative and antagonistic with Deyoe and her co-employees after the filing of her complaint. Plaintiff's unresponsiveness also led Deyoe to channel some of her work to others. With respect to Deyoe's failure to renew the plaintiff's contract, the court is satisfied that Deyoe declined to renew her contract because of the hostility generated, to some degree, by the plaintiff's own ac-

tions, and principally because the plaintiff had voluntarily refused to continue working at Grain Science.

As such, the plaintiff has not demonstrated to the court's satisfaction that a causal connection exists between the plaintiff's protected activities and the non-renewal of her contract or the hostility at work. Even if such a causal connection were shown, however, the defendants have articulated legitimate non-discriminatory reasons. Plaintiff failed to prove that the defendants' proffered reasons were pretextual. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). As a result, the plaintiff's retaliation claim must fail.

### 3. CONSTRUCTIVE DISCHARGE

■ Constructive discharge occurs when an employer, "by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in plaintiff's position would feel compelled to resign." *Ramsey v. City and County of Denver*, 907 F.2d 1004, 1010 (10th Cir.1990) (citing *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986)). Under this standard, an employer's subjective intent to force the employee into quitting is irrelevant; it is sufficient that the employer maintained or allowed working conditions intolerable to the employee. *See id.;* Larson, *Employment Discrimination* 8–179 (1991).

■ Plaintiff claims that the hostile working environment at Grain Science led to her constructive discharge.[6] The court disagrees. While it is true that the court finds the plaintiff's work environment to be hostile, a finding of sexual harassment does not necessarily mandate a finding of constructive discharge; otherwise the two doctrines would be duplicative. Although a working environment may be severe

---

6. The plaintiff also asserts that the University's offer of an inferior position at the Library contributed to her constructive discharge. In light of the court's finding that the Library position was equivalent to plaintiff's position at Grain Science, plaintiff's assertion is rejected. Plaintiff also intimates that Deyoe's failure to renew

her contract constitutes actual discharge. The court disagrees that the plaintiff was actually discharged from the University in view of the University's good faith attempts to transfer her to another department after her contract at Grain Science expired.

enough to constitute sexual harassment, it may nevertheless be insufficiently intolerable or "difficult" to compel a voluntary resignation.

In the present case, the plaintiff was not constantly assailed by harassment. Nor were there any other aggravated circumstances—such as retaliation—to justify a voluntary resignation. Moreover, the plaintiff was offered a legitimate, equivalent position in another department to mitigate any fears or stress that she might have had. Plaintiff, thus, cannot maintain that her work conditions were intolerable when she was given a bona fide offer to work in a neutral non-hostile work environment. Plaintiff also cannot claim that her complaint was ignored; she had timely access to the University's comprehensive internal grievance procedure, which gave serious regard to her complaint. *Cf. Llewellyn v. Celanese Corp.*, 693 F.Supp. 369, 380 (W.D.N.C.1988) (Voluntary resignation was justified in sexual harassment case because employer demonstrated "callous disregard" for plaintiff's claim and conducted investigations and disciplinary proceedings that "def[ied] common sense, and belie[d] any genuine attempt to determine whether plaintiff's allegations were true."). The court concludes, therefore, that the plaintiff's work conditions were not so difficult that a reasonable person would feel compelled to resign. In the court's view, a reasonable person in the plaintiff's position would not have quit but would have accepted the transfer to the Library and continued working there while pursuing the available legal remedies.

## 4. STATE PENDENT CLAIMS

█ Plaintiff also presents Kansas common law claims based on battery and assault. Because the plaintiff's pendent state claims share "a common nucleus of operative facts" with her federal Title VII claims, the court has jurisdiction to address the merits of her state claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

█ Under Kansas law, a battery is the unprivileged touching or striking of one person by another, done with the intent of bringing about either a contact or apprehension of contact that is harmful or offensive. *Stricklin v. Parsons Stockyard Co.*, 192 Kan. 360, 388 P.2d 824 (1964). Assault, on the other hand, is "an intentional threat or attempt, coupled with apparent ability, to do bodily harm to another, resulting in immediate apprehension of bodily harm." *State v. Hardisty*, 122 Kan. 527, 253 P. 615 (1927). The statute of limitations for both actions is one year. Kan. Stat.Ann. § 60–514(2) (1983).

The court concludes that Deyoe's act of slapping the plaintiff on her buttocks constitutes a battery. The act was an intentional, unprivileged physical contact that was offensive to the plaintiff. The court concludes also that Deyoe's subsequent verbal remark that he felt like hitting the plaintiff on the buttocks amounts to an assault; it was an intentional threat—made with apparent ability—to inflict a battery on the plaintiff, resulting in immediate apprehension. Neither action is barred by the one-year statute of limitations.

## 5. REMEDIES

Title VII authorizes a court to order any appropriate affirmative action, including reinstatement, backpay, or any other equitable relief. 42 U.S.C. § 2000e–5(g). Plaintiff requests backpay and, in lieu of reinstatement, frontpay through June 1993, the date when the plaintiff expects to graduate and secure better employment opportunities elsewhere.

█ Because this court has concluded that the plaintiff was sexually harassed by defendant Deyoe, the plaintiff is entitled to some relief under Title VII. However, in light of the plaintiff's unreasonable voluntary resignation, the plaintiff's request for backpay is denied. *See Brooms v. Regal Tube Co.*, 881 F.2d 412, 421 (7th Cir. 1989) (backpay may be awarded when the plaintiff can demonstrate that she was discharged, either actually or constructively). Moreover, the plaintiff failed to mitigate her damages by refusing comparable full-time positions offered by the University, thereby foreclosing an award of backpay.

*See Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982) (Title VII plaintiff "forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied."). Plaintiff's request for frontpay through June 1993 is also denied because of the speculativeness of her request and the uncertainty that her contract would be renewed annually through 1993, and because the plaintiff has demonstrated an unwillingness to work at Kansas State University in refusing to accept or interview for comparable positions at the University. The court, therefore, awards the plaintiff nominal damages in the sum of one dollar.[7]

Plaintiff is also entitled to attorney's fees under 42 U.S.C. § 2000e–5(k). Despite losing on her retaliation and constructive discharge claims, the plaintiff succeeded on her main theory, sexual harassment. She has, thus, succeeded on a "significant issue in litigation which achieves some of the benefit [she] sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoted in *Derr*, 796 F.2d at 344). Because the plaintiff is a prevailing party, she is entitled to reasonable attorney's fees even though she won only nominal damages. *Derr*, 796 F.2d at 344; *see Nephew v. City of Aurora*, 766 F.2d 1464, 1466 (10th Cir.1985) ("[w]e have no trouble finding that the plaintiffs ... are the prevailing parties even though they won only nominal damages").

On the battery and assault claims against Charles Deyoe, the court awards the plaintiff actual damages in the sum of seventy-seven dollars for counseling costs. Furthermore, in the interest of deterring Deyoe and others in similar positions of authority from engaging in such repugnant behavior, the court awards the plaintiff punitive damages in the amount of five thousand dollars. *See Nordstrom v. Miller*, 227 Kan. 59, 605 P.2d 545 (1980) (punitive damages are awarded in the discretion of the court).

IT IS BY THE COURT THEREFORE ORDERED that judgment is hereby entered for the plaintiff on the sexual harassment claim against the defendants Kansas State University and Charles Deyoe in the amount of $1 plus attorney's fees. The parties shall comply with D.Kan. Rule 220 on the attorney's fees award for the sexual harassment claim.

IT IS BY THE COURT FURTHER ORDERED that judgment is hereby entered for the plaintiff against Charles Deyoe on the battery and assault claims in the amount of $77 as compensatory damages and $5,000 for punitive damages.

IT IS BY THE COURT FURTHER ORDERED that judgment is hereby entered for the defendants on the constructive discharge and retaliation claims.

---

7. Some courts have declined to award nominal damages under Title VII, reasoning that an award of damages is a legal, as opposed to equitable, remedy. *See, e.g., Swanson v. Elmhurst Chrysler Plymouth, Inc.*, 882 F.2d 1235, 1239–40 (7th Cir.1989). The above reasoning, however, leads to the inequitable result of leaving a plaintiff who does not succeed in receiving backpay, reinstatement, frontpay or other traditional Title VII relief without any remedy, and allows the defendant to be the prevailing party—even though the plaintiff has proven her Title VII case. *See id.* at 1240. Such a ruling, this court believes, fails to comport with Title VII's exhortation to "make whole" victims of discrimination.

The Tenth Circuit, in addressing the issue of attorney's fees in Title VII, held that a Title VII plaintiff, as a prevailing party, would be entitled to "at least nominal damages," and is therefore entitled to attorney's fees. *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986). Although *Derr* did not directly address the issue of nominal damages in Title VII, it indicates the Tenth Circuit's willingness to recognize the availability of nominal damages in Title VII suits. *See also Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905 (11th Cir.1988) (plaintiff in Title VII sexual harassment case may recover nominal damages).