**Sheba M.J. MOHANKUMAR, Plaintiff,**

v.

**KANSAS STATE UNIVERSITY; Ronald Marler, individually; and Jon D. Dunn, individually, Defendants.**

**Nos. 97–1199–WEB, 98–1174–WEB.**

United States District Court,
D. Kansas.

May 13, 1999.

Pantaleon Florez, Jr., Florez & Frost, P.A., Topeka, KS, for Plaintiff.

Jennifer Kassebaum, Kansas State University Legal Dept., Manhattan, KS, for Defendants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

Plaintiff Sheba M.J. MohanKumar, a native of India, graduated with a Ph.D. degree from Kansas State University in December of 1996. She taught several classes at KSU while obtaining her degree. After graduating, she was hired by KSU as a post-doctorate fellow. In this consolidated action, plaintiff alleges that the defendants engaged in unlawful employment discrimination against her on account of sex and national origin in violation of Title VII and 42 U.S.C. §§ 1981 and 1983.[1] The matter is now before the court on the defendants' motion for summary judgment. The court finds oral argument would not assist in deciding the issues presented.

### I. *Facts.*

Plaintiff is a 33–years old female native of India who came to Kansas State University in 1990 with the equivalent of a doc-

---

1. Plaintiff also asserted a claim in the amended complaint pursuant to Title VI, 42 U.S.C. § 2000d et seq. That claim was subsequently withdrawn. *See* Doc. 50 at 25.

torate of veterinary medicine (DVM) to pursue a Ph.D. in Biochemistry.

In 1991, plaintiff transferred to and successfully completed a master's program in Biochemistry. In April 1992, plaintiff was accepted as a Ph.D. candidate in the Department of Anatomy and Physiology in the College of Veterinary Medicine. She began her graduate studies in August of 1992. Upon admission to the graduate school, the Associate Dean indicated on an Immigration & Naturalization Service (INS) form that plaintiff was expected to complete her studies not later than August 31, 1998.

At all times relevant to this suit, Dr. Jon Dunn was the Department Head of Anatomy and Physiology.

When plaintiff was accepted into the doctoral program in the Department of Anatomy and Physiology, she was offered a graduate research assistantship, which provided a stipend in the amount of $18,-000 per year. The offer was conditioned upon plaintiff teaching one semester for each academic year of support received. Although plaintiff contends the offer stated that her stipend would be renewed annually, in fact it said only that this was "typically" done. Plaintiff accepted the graduate research assistantship.

Only graduate students in good academic standing are eligible to receive a graduate assistantship and accompanying stipend support. Graduate students who receive stipends are not entitled to retirement benefits, vacation or sick leave. Social security is not withheld from stipends. At the time plaintiff was a graduate student, graduate assistants were not eligible for group health insurance benefits, although that policy has since changed.

Plaintiff's W–2 forms for the time in question listed her as an "employee" and the State of Kansas as her "employer."

To be paid by the University, plaintiff was required to perform teaching services. Teaching and research services are performed by graduate students on a "four-tenths" part-time basis. The selection of graduate students who receive stipends

and the funding source of stipends are determined by the department. Stipends are funded by state monies or by grant monies and may be renewed annually.

Plaintiff received a graduate stipend for the four and one-half years she was a graduate student in the Department of Anatomy and Physiology, from August 1992 until December 1996. After graduation, she was no longer eligible to receive a stipend.

As early as January 1992, the departmental faculty discussed limiting the duration of stipends to four years. A memo from Dr. Dunn containing guidelines for amounts and duration of stipends, which was said to have been worked out by the Graduate Executive Committee and Dr. Dunn, was distributed to the faculty in December of 1992. Dr. Dunn noted in the memo as an additional caveat that "departmental support for graduate stipends will be limited to 5 years for an entering BS and 4 years for an entering DVM." In May 1995 the departmental faculty adopted these guidelines which limited the duration of stipends to five years for students entering with a Bachelor of Science degree (master's candidates) and four years for students entering with a DVM degree (Ph.D. candidates).

The salary guidelines accompanying the December 3, 1992 memo provided for a minimum salary for an entering student holding a D.V.M. to be $20,000 per year. Plaintiff's salary was $18,000.

On May 12, 1995, Dunn notified members of the department of the recently adopted guidelines regarding graduate students. On or about May 12, 1995, Dr. Dunn sent a memo addressed to plaintiff informing her of the guidelines adopted by the department. The guideline regarding time lines for graduate student stipends was set forth in the memo as follows:

> "The duration of graduate student stipends from departmental sources be [sic] a maximum of 5 years for students entering our graduate program with a

B.S. who are working toward a Ph.D. degree and 4 years for students entering our graduate program with an MS or D.V.M. (or equivalent) degree who are working toward a Ph.D. degree."

Below this, the memo stated: "Based on the above, the maximum period through which a graduate stipend will be provided will be the 1995–96 academic year (June 17, 1996). Please note, however, that graduate stipends are annual contracts and renewal is based on satisfactory performance in both the research and teaching laboratories and available funding."

Upon receipt of the memorandum, plaintiff told her major professor, Dr. Kaleem Quadri, that she did not think it applied to her, and that "maybe we [would] think about this later." Dr. Quadri asked her if she would be able to finish by June of 1996. Plaintiff responded that she was not sure.

In a subsequent June 5, 1995, memo to plaintiff, Dunn indicated that plaintiff's stipend had been renewed for the fiscal year 1996. No mention was made in this memo of this being her last stipend.

Plaintiff believed her stipend would not be eliminated in June 1996 because she believed Dunn knew she would not be able to complete her Ph.D. work by then.

When plaintiff had entered the department, the Constitution and by-laws in effect did not contain a time limit for completion of a Ph.D. or for GRA funding.

Eleven months after receiving the May 12 memo from Dr. Dunn, plaintiff requested a stipend extension. After an exchange of correspondence, plaintiff met with Ron Marler, who was the Dean of the College of Veterinary Medicine, and Dr. Dunn on May 22, 1996. At that meeting, plaintiff complained to the Dean that the denial of additional stipend support was "harass-

ment" because she was one of Dr. Quadri's students. (It appears undisputed there was some hostility at the time between Dr. Dunn and Dr. Quadri, who was a professor in the Department of Anatomy and Physiology and plaintiff's major professor.) After that meeting, plaintiff prepared a written account of the meeting in which she again stated that she was treated unfairly because she was one of Dr. Quadri's graduate students. Plaintiff did not allege during the meeting that this discrimination was based on her membership in any protected class. After meeting with Marler and Dunn, plaintiff sought counseling in May of 1996.

According to plaintiff, Dr. Dunn made comments relative to her national origin between August 1992 and May 1996; some of these comments were made four or five times.[2] She testified that Dr. Dunn did not make any such comments after the May 1996 meeting. Plaintiff testified that she did not see Dr. Dunn often, and although she found Dunn's remarks relating to her national origin and culture to be offensive, she testified that the comments did not bother her that much.

Blane Lowe, a Caucasian American male, was a graduate student in the Department from May 1988 to October 1994. He received his Ph.D. in October 1994. Lowe had received financial support for six years to June 1994. Lowe had received two years of stipend support prior to Dr. Dunn's hire as department head. He had started his graduate studies as a Ph.D. candidate, changed to a master's degree candidate after two years, and changed back to a Ph.D. candidate in 1992. Lowe and plaintiff each had difficult teaching assignments.

Jimmie "Lonnie" Kilgore, a Caucasian American male, received stipend support

---

**2.** When asked to recount these comments, plaintiff testified: "I believe he [Dunn] said—when he was walking out with a donut in his hand he would call it a typical Indian breakfast, when he saw me on the way, if it snows outside he would say typical Indian weather." And when he saw me in the hallways walking with my husband he used to say that I had to walk two paces behind my husband because it was an Indian custom to do so. And one day when I was having coffee in the break room he stopped by suddenly and he asked me in a derogatory fashion "Do they make cars in India?" Pl. Exh. 9 at 9–10.

from the Department of Anatomy and Physiology for four years (from August 18, 1991, to August 17, 1995).[3] Kilgore had also received a stipend from the Department of Physical Education and Leisure Studies in the College of Arts and Sciences for approximately one and a half years (from January 1, 1990, to May 17, 1990, and from August 18, 1990 to May 17, 1991).

Plaintiff received total stipend support from the Department of $131,436 over a period of approximately four and one-half years. Blane Lowe received total stipend support from the Department of $119,288 over a period of approximately six years. Lonnie Kilgore received total stipend support from the Department of $62,370 over a period of approximately four years.

Plaintiff had received stipends for two years (August 18, 1990 to August 17, 1992) from the Department of Biochemistry in the College of Arts and Sciences while she was a master's candidate.

Plaintiff was required to help teach Gross Anatomy II for four consecutive years, despite her requests for a less demanding course. Plaintiff was one of five graduate student instructors who assisted a faculty member in teaching the course.

Plaintiff received only $350 travel support for a June 1996 trip to San Francisco, although the Department's written policy provided for $500. Plaintiff's request for travel support was submitted late. A white student who submitted a similar request at the same time received the same amount as plaintiff.

On or about July 3, 1996, plaintiff and another graduate student who shared an office were notified by Dr. Dunn in writing that they would be relocated to another office due to the hire of Dr. Judy Provo, a new faculty member. Dr. Dunn had previously told plaintiff's husband, who was an applicant for the position filled by Dr. Provo, that Dr. Hartke's office would be given

to the successful applicant. No other office occupants were relocated or asked to relocate. At the time Dunn attempted to relocate plaintiff, there were other office spaces available. Being moved in the middle or near the end of a research project could be very detrimental to the results.

On or about July 10, 1996, plaintiff met with Dawn Anderson, the Associate Director of the Office of Affirmative Action at KSU, and complained that Dr. Dunn was discriminating against her on the basis of national origin and gender. This was plaintiff's first formal complaint of discrimination on the basis of national origin or gender.

In July of 1996, plaintiff's husband Dr. P.S. MohanKumar filed a claim of discrimination with the university's Affirmative Action Office after Dr. Dunn failed to hire him for the faculty position for which Dr. Provo was hired.

After Ms. Anderson and Dean Marler were unable to resolve plaintiff's complaint, plaintiff filed a complaint with the university's Provost. This complaint, which consisted of eleven pages, contained one sentence complaining about alleged remarks by Dunn relating to plaintiff's heritage and gender. The Provost's response to plaintiff did not address plaintiff's complaint regarding Dunn's remarks.

Plaintiff remained in her office and received a graduate stipend until she completed her graduate studies and received her Ph.D. in December 1996.

In order to have access to the library and departmental facilities after graduation, plaintiff enrolled in a class and paid tuition.

On January 24, 1997, Dunn received a request from Dr. Quadri for waiver of recruitment and request to hire plaintiff in his lab as a post-doctoral fellow ("post-

---

**3.** Plaintiff asserts that Kilgore "was allowed five years, four months to earn his degree and received financial support for 5 years." As the defendants point out, the Human Resource records attached to Dawn Anderson's supplemental affidavit show that Kilgore received only four years of support from the Department of Anatomy and Physiology.

doc") on Dr. Quadri's non-state funded grant.

A post-doctoral fellowship is an employment position. In the Department of Anatomy and Physiology, such positions were usually filled after a competitive recruitment process unless a waiver was obtained. There are no records to indicate that plaintiff applied for the position.

Upon receipt of Dr. Quadri's request to waive recruitment, Dr. Dunn forwarded the documents to the Dean's office with comments that Dunn would not approve.

On January 29, 1997, Dunn issued a memo proposing guidelines concerning temporary appointments, including the hiring of post-doctoral fellows. On January 31, 1997, Dunn proposed a new department rule precluding the hiring of the university's own Ph.D. graduates into temporary positions, including post-doctoral positions. The faculty in the Department of Anatomy and Physiology approved the policy. This policy is similar to the university's policy pertaining to the hiring of its own graduate students into faculty positions.

In the thirty years Dr. Westfall had been in the department, it had been the practice that faculty could ordinarily hire whomever they wanted (for a post-doc position) on a non-state funded grant.

The College of Veterinary Medicine hired one KSU graduate as a post-doc. He obtained a Ph.D. in Biology from the College of Liberal Arts and Sciences and had not done his graduate research in the lab where he was hired.

The university's Affirmative Action Plan states that the practice of not hiring KSU graduates should be waived when local qualified minority and female candidates are identified.

On or about January 30, 1997, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging discrimination on the basis of sex, national origin and retaliation, but not race. On February 5, 1997, the EEOC issued a dismissal and notice of right to sue.

The dean conferred with the university's provost, Dr. James R. Coffman, who asked the Director of Employee Relations to review the situation and make a recommendation to him concerning Dr. Quadri's request. The Director, Carmin Ross–Murray, recommended that Dr. Quadri be allowed to appoint plaintiff to the position. This recommendation was adopted by Dean Marler and by Dr. Dunn. In April 1997, plaintiff was hired as a post-doc in Dr. Quadri's lab without a competitive search.

Plaintiff worked as a post-doc for Dr. Quadri until his death in March 1998. After Dr. Quadri's death, plaintiff initiated a renewal of a Kansas Racing Commission grant. She is currently employed under this grant.

According to the testimony of Dr. Westfall, Dr. Dunn once suggested that she change the wording in an advertisement for a position because he said "if a black comes in and says he can punch the 'on' button, then I'd have to hire him."

On June 9, 1993, Professor Westfall had written a letter to the then-dean expressing her concern that a gender problem existed within the department and that the source of the problem was Jon Dunn. Since that time, Dr. Dunn has increased the number of female faculty in the Department. Dr. Dunn believes Dr. Westfall to be a credible person.

Dr. Dunn described plaintiff's teaching as excellent and stated that she did a fine job of research. Dunn believes plaintiff's publishing record is good, and her publishing was good for the university.

Plaintiff initiated Case No. 97–1199 by filing a complaint on May 5, 1997.

On August 26, 1997, plaintiff filed another EEOC complaint alleging national origin discrimination and retaliation arising from her non-competitive hire as a post-doc. The EEOC issued a dismissal and notice of suit rights on February 18, 1998.

Plaintiff filed Case No. 98–1174 on May 18, 1998.

Four complaints have been made against Dr. Dunn on the basis of national origin discrimination between July 1996 and May 1998. These complaints were filed by Dr. Quadri and his graduate students after Dr. Dunn attempted to relocate Dr. Quadri's lab space.

## II. *Summary Judgment.*

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

## III. *Discussion.*

### A. *Refusal to Grant Continued Stipend.*

■■■ Plaintiff first claims she was discriminated against in the terms and conditions of employment because two American white male participants in the doctoral program were given stipends for five and six years, while she was only given a stipend for four and a half years.[4] Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to fail or refuse to hire an individual, or otherwise to discriminate against an individual with respect to her compensation, terms, conditions, or privileges of employment because of such individual's sex or national origin. *See* 42 U.S.C. § 2000e–2(a)(1). The court will assume for purposes of this claim that by virtue of her agreement to teach classes at the university in exchange for a stipend, plaintiff was an employee covered by Title VII and that the discontinuation of a stipend was either a refusal to hire her or a denial of a term or condition of her employment. *Cf. Ivan v. Kent State University,* 863 F.Supp. 581 (N.D.Ohio 1994), *aff'd,* 92 F.3d 1185 (6th Cir.1996) (unpublished) (graduate student covered by Title VII). Even so, this claim fails because plaintiff cites no evidence to reasonably suggest the denial of a continued stipend was due to her national origin or gender. Under Title VII, the crucial inquiry is whether the defendant intentionally discriminated against the plaintiff. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A plaintiff may prove intentional discrimination either by direct or circumstantial evidence. *See U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Plaintiff argues direct proof of discrimination is shown by Dr. Dunn's various references to her national origin. The court cannot agree. A plaintiff must demonstrate a nexus between any allegedly discriminatory statements and the employer's decision. *Cone v. Longmont United Hosp. Assn.,* 14 F.3d 526, 531 (10th Cir.1994). The comments cited by plaintiff show Dr. Dunn referred to plaintiff's national origin on several occasions, but they do not reasonably suggest hostility or ill will towards plaintiff because of her Indian origin. *Cf. Tomsic v. State Farm Mutual Auto. Ins. Co.,* 85 F.3d 1472, 1479 (10th Cir.1996) (remarks exhibiting bias which refer directly to plaintiff may support inference of discrimination). Occasional and oblique references to a person's national origin—at least under the circumstances cited by plaintiff—are not sufficient to evidence a discriminatory animus. More to the point, these remarks do

---

4. The amended complaint also alleges "Plaintiff was notified that she was required to complete her doctorate degree in three years and ten months" while these other two students "were allowed five and six years to complete their research and PhD requirements." Doc. 22 at 4. As plaintiff's deposition testimony makes clear, she felt constrained to complete her Ph.D. work because of the discontinuance of her stipend, not because of any time limitation the defendants placed on her Ph.D. work. *MohanKumar Depo.* at Pp. 48–49.

not reasonably suggest that the limit on plaintiff's stipend was based upon such discrimination.

Plaintiff also contends discrimination is evidenced by the defendants' more favorable treatment of two white male graduate students in the Department. The evidence, however, fails to support this charge. The record shows that one of these students, Lonnie Kilgore, received only four years of support from the Department of Anatomy and Physiology. Thus, he was not treated more favorably than plaintiff. As for the other student, Blane Lowe, it is true that he received departmental support for six years. Unlike plaintiff, however, he had changed from a Ph.D. to a master's program and back to a Ph.D. during the course of his support. Also, Lowe had received two years of support before Dr. Dunn became the head of the Department. Prior to Dr. Dunn's arrival, the Department apparently had no specific policy regarding the duration of stipends. Lowe was thus not similarly situated to plaintiff, and his treatment does not reasonably suggest that plaintiff's stipend was limited due to unlawful discrimination. (As the defendants also point out, plaintiff actually received a greater total stipend than Lowe.) Moreover, any claim that the limit was due to discrimination is belied by the fact that Dr. Dunn advocated a four year limit on such stipends in January of 1992, before plaintiff even began her doctoral studies, and he informed the faculty of such a limit in December of 1992, three years before plaintiff's stipend was discontinued. Despite that limit, plaintiff's stipend was in fact extended an extra six months, in which time she completed her Ph.D. Under these circumstances, the record fails to show a genuine issue as to whether the denial of a continued stipend was based on plaintiff's national origin or gender. As such, the defendants are entitled to judgment as a matter of law on this claim.

### B. Retaliation Claim.

i. *Attempt to Move Plaintiff's Office.* Plaintiff next claims Dr. Dunn retaliated against her for complaining about national origin and sex discrimination by attempting to move her from her office, in violation of Title VII. Section 2000e–3 makes it an unlawful employment practice "for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

Plaintiff's claim of retaliation regarding the attempted move fails for two reasons. First, plaintiff cites no evidence that this action was taken in retaliation for activity protected by Title VII. Although plaintiff argues she made "complaints of discrimination" in a May 17, 1996, memo and in the May 22, 1996, meeting with Dean Marler and Dr. Dunn, which occurred before Dunn directed her to move from her office, plaintiff cites no evidence that these complaints involved any allegations of sex or national origin discrimination. Rather, she complained that Dr. Dunn was being unfair because she was one of Dr. Quadri's graduate students. Such a complaint does not fall within the scope of Title VII's protections. *See Sanchez v. Denver Public Schools,* 164 F.3d 527, 533 (10th Cir.1998) (plaintiff claiming retaliation must show she was engaged in opposition to Title VII discrimination). *Cf. Archuleta v. Colorado Dept. of Institutions,* 936 F.2d 483, 487 (10th Cir.1991) (alleged retaliation for complaining of unfair treatment not covered by Title VII). It was only after Dr. Dunn informed plaintiff that her office would be relocated that she made a complaint of sex and national origin discrimination. These circumstances do not give rise to an inference of unlawful retaliation.

Second, this claim fails because Dr. Dunn's attempt to move plaintiff's office does not constitute the type of adverse employment action necessary to support a retaliation claim. Although Dr. Dunn told

plaintiff that she would have to move, she took the matter up with the Provost and in fact retained the office until she completed her Ph.D. *Cf. Sanchez,* 164 F.3d at 533 (unrealized threats to discipline plaintiff did not significantly affect her employment status and therefore did not constitute adverse employment action remediable under Title VII). Plaintiff alleges that the distraction caused by this episode interfered with her Ph.D. research. However, it is not enough that this incident may have caused distress or impacted her academic work; plaintiff must show it altered the terms of her employment or adversely affected her status as an employee. *Id.* She has failed to cite evidence to support that requirement.

■ ii. *Plaintiff's Post–Doc Position.* Plaintiff also asserts a claim for retaliation based on Dr. Dunn's opposition to her being hired as a post doctoral fellow. Although plaintiff was in fact hired for this position, she argues that this "was delayed for three months by Dunn's pretextual non-support ..., causing a loss of three months' salary...." Pl. Mem. at 22. The defendants contend, among other things, that plaintiff suffered no adverse employment action because she was hired despite Dr. Dunn's opposition. Def. Reply at 14. The court agrees with the defendants. After Dr. Dunn indicated he was opposed to plaintiff's hire, the matter was referred to the Dean, then to the Provost, and finally to the Director of Employee Relations, who recommended that Dr. Quadri be permitted to hire the plaintiff. Dr. Dunn then adopted this recommendation and plaintiff was hired. Plaintiff offers no evidence that the delay of which she complains was in any sense extraordinary or that she was treated differently in this respect than any other person. She simply assumes an entitlement to begin working as soon as Dr. Quadri requested it. Nor does plaintiff cite any evidence that Dr. Dunn was responsible for delaying a final decision on the question of her employment. The court notes that plaintiff was hired for the position without a competitive search, which was contrary to the normal practice

of the Department and which undoubtedly sped up the process. Although the court does not suggest that a delay in hiring could never form the basis of a discrimination claim, under these circumstances it would be manifestly unreasonable to subject the University to liability based upon its internal review of Dr. Quadri's request to hire her. In sum, the court finds plaintiff has failed to cite evidence to support a claim of retaliation.

### C.  *Hostile Work Environment.*

■ Plaintiff next claims she was subjected to discrimination on the basis of gender and national origin because of a hostile work environment. Specifically, this claim "is based upon Dunn's persistent offensive comments regarding plaintiff's national origin and gender." Pl. Resp. at 23. To establish such a claim under Title VII sufficient to survive a motion for summary judgment, plaintiff must show that the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and the harassment stemmed from (in this case) national origin or gender-related animus. *See Bolden v. PRC Inc.,* 43 F.3d 545, 550–51 (10th Cir.1994) (*citing Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). For purposes of determining whether a working environment is sufficiently hostile or abusive, the relevant factors include: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In addition, there must be evidence that the environment was both subjectively and objectively hostile or abusive. *See Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998).

 Plaintiff clearly fails to cite evidence sufficient for a hostile work environment claim. Her claim is based solely on the comments of Dr. Dunn, but by plaintiff's own admission she did not see Dr. Dunn very often. Although plaintiff found these comments offensive, they were not physically threatening or abusive. Indeed, plaintiff testified that the comments did not bother her that much. Finally, there is no evidence that these comments in any way altered the conditions of plaintiff's employment or her status as a teacher for the university. In sum, there is no evidence to establish the severe, pervasive, and frequent discrimination that is required to prove a hostile or abusive work environment. *See Meritor,* 477 U.S. at 65, 106 S.Ct. 2399. *See also Smith v. Norwest Financial Acceptance, Inc.,* 129 F.3d 1408, 1412 (10th Cir.1997) (the mere utterance of a statement creating offensive feelings in an employee does not sufficiently affect the conditions of employment to violate Title VII); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1412–13 (10th Cir.1987) (requiring evidence of "a steady barrage of opprobrious racial comment" to show a racially hostile work environment). Accordingly, the defendants are entitled to summary judgment on this claim.

D. *Section 1981 and 1983 Civil Rights Claims.*

 Plaintiff contends the defendants' conduct violated 42 U.S.C. §§ 1981 and 1983 as well as Title VII. The court concludes that the defendants are entitled to summary judgment on these claims. Insofar as the defendant University is concerned, any claims for money damages are barred by the Eleventh Amendment. *Klein v. Univ. of Kansas Med. Center,* 975 F.Supp. 1408 (D.Kan.1997). Any claim for equitable relief against the University now appears to be moot. As for defendant Ronald Marler, plaintiff has produced no evidence that any of his actions were motivated by animus against plaintiff on account of her gender, national origin or race. He is therefore entitled to summary judgment on the §§ 1981 & 1983 claims.

As for Dr. Dunn, the court finds he is entitled to summary judgment on the claim under § 1983, as he has asserted the defense of qualified immunity and plaintiff has failed to identify the clearly established constitutional right that he allegedly violated. Moreover, plaintiff's §§ 1981 and 1983 claims against Dr. Dunn fail for the same reasons previously expressed with respect to the Title VII claims. *See Drake v. City of Fort Collins,* 927 F.2d 1156, 1162 (10th Cir.1991) (discrimination claims that failed under Title VII failed also under §§ 1981 & 1983).

IV. *Conclusion.*

Defendants' Motion for Summary Judgment (Doc. 42) is hereby GRANTED. The clerk of the court is directed to enter a judgment of dismissal in favor of the defendants.